IN THE

# United States Court of Appeals

FOR THE FIFTH CIRCUIT

No.22-50951

UNITED STATES OF AMERICA,

PLAINTIFF-APPELLEE

v.

JOSE GUADALUPE DIAZ-DIAZ,

DEFENDANT – APPELLANT

consolidated with

No. 22-50956

UNITED STATES OF AMERICA,

PLAINTIFF-APPELLEE

v.

MARTIN PEREZ MARRUFO,

DEFENDANT – APPELLANT

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

## BRIEF OF DEFENDANT-APPELLANT DIAZ

Philip J. Lynch
Law Offices of Phil Lynch
17503 La Cantera Parkway
Suite 104-623
San Antonio, Texas 78257
(210) 378-3114

*Attorney for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

*United States v. Jose Diaz and Martin Perez Marrufo*

Nos. 22-50951 and 22-50956

The persons having an interest in the outcome of this case are:

1.    **Jose Diaz Diaz,** Defendant-Appellant;

2.    **Jaime Esparza,** U.S. Attorney;

3.    **Jay Bauer, Steven Spitzer,** and **Christina Taylor,** Assistant U.S. Attorneys, who represented Plaintiff-Appellee in the district court;

4.    **Art Werge,** Attorney at Law, who represented Defendant-Appellant Pike in the district court;

5.    **Philip J. Lynch,** Attorney at Law, who represents Defendant-Appellant Diaz in this Court;

6.    **Martin Perez Marrufo,** Codefendant-Appellant; and

7.    **Leonard Morales,** Attorney at Law, who represented Codefendant-Appellant Marrufo in the district court and represents him in this Court.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

*/s/ Philip J. Lynch*

i

## REQUEST FOR ORAL ARGUMENT

Jose Diaz requests oral argument. Diaz challenges his convictions for murder and the consecutive life sentences he received. The trial record is lengthy and complicated and oral argument may assist the Court in resolving the issues presented.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................... i

REQUEST FOR ORAL ARGUMENT ........................................................ ii

TABLE OF CONTENTS ............................................................................ iii

TABLE OF AUTHORITIES ...................................................................... iv

SUBJECT MATTER AND APPELLATE JURISDICTION ........................ 1

ISSUES PRESENTED ................................................................................ 2

STATEMENT OF THE CASE .................................................................... 3

SUMMARY OF THE ARGUMENTS. ....................................................... 16

ARGUMENTS AND AUTHORITIES. ...................................................... 19

CONCLUSION ......................................................................................... ?

CERTIFICATE OF SERVICE .................................................................... 34

ECF CERTIFICATION .............................................................................. 35

# TABLE OF AUTHORITIES

**Cases**      **Page(s)**

*Alleyne v. United States,*
  570 U.S. 99 (2013).................................................................. 31

*Andrus v. Glover Constr. Co,*
  446 U.S. 608 (1980)................................................................ 32

*Apprendi v. New Jersey,*
  530 U.S. 466 (2000)................................................................ 31

*Henderson v. United States,*
  568 U.S. 266 (2013)................................................................ 34

*In re Winship,*
  397 U.S. 358 (1970)..........................................................19, 26

*Jackson v. Virginia,*
  443 U.S. 307 (1979)................................................................ 19

*Koons Buick Pontiac GMC, Inc. v. Nigh,*
  543 U.S. 50 (2004).................................................................. 32

*Rosemond v. United States,*
  572 U.S. 65 (2014)............................................................27, 28

*United States v. Blanco,*
  27 F.4th 375 (5th Cir. 2022)................................................... 30

*United States v. Castrellon,*
  636 Fed. Appx. 204 (5th Cir. 2016) ..............................23, 24, 25

*United States v. Daniels,*
  726 F.3d 562 (5th Cir. 2013)...............................................19, 26

*United States v. Fernandez,*

559 F.3d 303 (5th Cir. 2009)................................................... 20

*United States v. Ganji,*
880 F.3d 760 (5th Cir. 2018)................................................... 22

*United States v. Gonzales,*
841 F.3d 349 (5th Cir. 2016)................................................. 31

*United States v. Julian,*
633 F.3d 1250 (11th Cir. 2011)............................................. 31

*United States v. Longoria,*
569 F.2d 422 (5th Cir. 1978)...............................................26, 28

*United States v. Mitchell,*
792 F.3d 581 (5th Cir. 2015).................................................. 26

*United States v. Pettigrew,*
77 F.3d 1500 (5th Cir. 1996)...............................................23, 25

*United States v. Portillo,*
969 F.3d 144 (5th Cir. 2020).......................................26, 27, 28

*United States v. Rojas-Alvarez,*
451 F.3d 320 (5th Cir. 2006)................................................. 23

*United States v. Salazar,*
542 F.3d 139 (5th Cir. 2008)................................................. 30

*United States v. Torres,*
8 F.4th 415 (5th Cir. 2021)................................................... 30

*United States v. Wharton,*
320 F.3d 526 (5th Cir. 2008)............................................20, 21

**Statutes**

18 U.S.C. § 924(c) ...........................................2, 3, 15, 18, 26, 30, 31, 32, 33

18 U.S.C. § 924(j)........................... 2, 3,15, 18, 25, 26, 39, 30, 31, 32, 33, 34

18 U.S.C. § 1028A ....................................................................... 33

18 U.S.C. § 1959(a) ...............................................................2, 3, 28

18 U.S.C. § 2332b........................................................................ 33

18 U.S.C. § 3231 ........................................................................... 1

28 U.S.C. § 1291 ........................................................................... 1

**Rules**

Federal Rule of Appellate Procedure 4(b) .................................... 1

## SUBJECT MATTER AND APPELLATE JURISDICTION

1.    **Subject Matter Jurisdiction in the District Court.** This case arose from the prosecution of an alleged offense against the laws of the United States. The district court had jurisdiction of this case under 18 U.S.C. § 3231.

2.    **Jurisdiction in the Court of Appeals.** This is a direct appeal from a final decision of the U.S. District Court for the Western District of Texas, entering judgment of criminal conviction and imposing sentence. This Court has jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

A criminal defendant who wishes to appeal a district court judgment must file notice of appeal with that court within 14 days after entry of either the judgment or a notice of appeal by the Government. In this case, written judgment was entered on October 30, 2022, and Diaz filed notice of appeal on October 31, 2022.

# ISSUES PRESENTED

1. Whether Diaz's conviction for conspiracy to commit murder in a foreign country must be reversed because the government's evidence failed to prove that any conspirator was present and took an overt act in the United States.

2. Whether Diaz's convictions under 18 U.S.C. § 924(j) and § 1959(a) must be reversed because the government's evidence failed to prove that Diaz murdered Jorge Salcido or aided and abetted the killing of Jorge Salcido.

3. Whether the consecutive life sentences imposed upon Diaz for his § 924(j) convictions must be vacated because the district court erroneously believed that consecutive sentences had to be imposed.

## STATEMENT OF THE CASE

The government's third superseding indictment brought eleven charges against Jose Diaz. The government alleged that Diaz had conspired to commit offenses including racketeering, drug-trafficking, money laundering, and committing murder in a foreign country. ROA.275-321 (Counts One through Five). The indictment also made three allegations that Diaz had violated 18 U.S.C. § 924(j) by causing, or aiding and abetting, the death of another by the use of a firearm during and in relation to a § 924(c) crime of violence. ROA.317-22 (Counts Six through Eight). Finally, the indictment alleged that Diaz had committed, or aided and abetted, three murders in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1). ROA.323-36 (Counts Nine through Eleven). Diaz pleaded not guilty, and at the close of his trial, he moved for judgement of acquittal on all counts. ROA.2357-69. The district court denied the motion. ROA.2369-70. The jury found Diaz guilty on all eleven counts. ROA.708-15.

The government's charges alleged that Diaz was an associate of Barrio Azteca, a criminal gang started in U.S. prisons, but that had an extensive free-world membership in Juarez, Mexico, where Diaz lived. ROA.1123; ROA.1171-72; ROA.1595; ROA.1869-70. The government presented substantial testimony about how Barrio Azteca came to be, how it was structured, and what it did. *See, e.g.,*

ROA.1590-92; ROA.1598-1607; ROA.1658-59.[1] The government's experts and cooperating witnesses explained that both the Juarez and El Paso manifestations of Barrio Azteca were involved in drug-trafficking, extortion, and deadly violence. *See, e.g.,* ROA.1708-1904. The violence was particularly severe in Juarez, where in the years 2008 through 2010, Barrio Azteca allied with the Juarez Cartel in its war with the Sinaloa Cartel for control of the city's entry points to the U.S. drug markets. ROA.1171-72; ROA.2072-73.

Before the cartel war started, Barrio Azteca members often worked legitimate jobs. ROA.1944; ROA.2204. When the war came, they were expected to take part. Barrio Azteca joined with La Linea, the enforcement arm of the Juarez cartel, to protect stashhouses, thwart attacks, and kill Sinaloa rivals. ROA.1296-98; ROA.1892-93. The war resulted in many deaths. Three of them occurred on March 13, 2010. Arthur Redelfs and his wife Leslie Enriquez were shot and killed while riding in their white Toyota SUV. ROA.1103-14; ROA.2073-74. In another part of Juarez, Jorge Salcido Ceniceros was shot and killed while riding in his white Honda Pilot SUV, a vehicle that carried Mexican plates. ROA.2321-44. The shootings

---

[1] Diaz does not summarize all of the trial testimony in this statement of facts. He instead focuses on the testimony most necessary to understanding the legal challenges he makes on appeal.

4

became known as the consulate murders because Enriquez had worked at the U.S. consulate in Juarez. ROA.1119; ROA.2073.

Redelfs, Enriquez, and Salcido had nothing to do with the cartel wars. ROA.1186-87. All had been at a children's birthday party and were on their ways home from the party. They were shot and killed because the party had been held in the neighborhood of Arturo Gallegos Castrellon, who was known by the nicknames Benny and Farmero,[2] at a time when Benny was unnerved because he thought someone in a white Honda Pilot SUV was surveilling him. He feared the Pilot was the harbinger of an assassination attempt on him and so directed his men to search for it. ROA.1186-87. ROA.1382-83. Later, someone saw Salcido's white Pilot at the party facility and reported it. Benny ordered it followed.

When Benny's people arrived, there were two white SUVs and people were getting into both vehicles. Salcido got in his Pilot; Redelfs and Enriquez got in their Toyota. Barrio Azteca hit team members followed both vehicles. ROA.2330-34. At some point, a man called Zorro informed Benny over the radio that the vehicle he

_____

[2] The trial testimony demonstrated that essentially every member of the Barrio Azteca was known by a nickname. Though participants were identified at least once during trial by their legal names, some, including Gallegos, were almost always referred to by their nicknames by testifying witnesses. To make the statement of the case comprehensible in light of the transcript, this brief refers to Gallegos as Benny and to star cooperating witness Jesus Chavez Castillo as Camello, as the witnesses at trial did.

and his team were following was a Toyota, and thus not the car they were looking for. Benny ordered the people in the car killed anyway. ROA.2310-11; ROA.2318-20.

Redelfs and Enriquez were shot near a Mexican government building on the river highway just across from downtown El Paso and near the Paso del Norte Bridge that connects El Paso and Juarez. ROA.1071-82; ROA.1109-10. Border Patrol cameras captured the aftermath of the shooting and the large numbers of Mexican officers who responded to it. ROA.1071-82; *see* Gov't Exs. 8A, 8B, and 8F. Government anonymous witness 1 (AW1) was in his mother's car at red light when Redelfs Toyota SUV struck it and then went on to hit another car. ROA.1088-92; ROA.1103. AW1's mother drove forward, then turned back to discuss the accident. ROA.1113-14. AW1 got out of the car to talk to the Toyota's driver. As he approached, he realized the vehicle was bullet riddled and the people in it were dead. ROA.1092-93; ROA.1105-06; ROA.1114; Govt' Exs. 9A-Q.

Salcido, in his white Pilot with Mexican plates, was shot by another Barrio Azteca assassin called Popeye. ROA.2074; ROA.2321-23; ROA.2344. Hilda Antillon, Salcido's wife, was following him home from the party when she saw an SUV pull up beside the Pilot and shoot into it. The shooters circled back and fired at the Pilot again. ROA.2335-38.

The murders attracted a significant amount of attention because Enriquez was an employee at the U.S. consulate in Juarez. ROA.2073-75. Contacts were made between the highest levels of the United States and Mexican governments and investigators from the FBI and DEA worked with Mexican law enforcement to try to solve the crime. ROA.2077-81. The U.S. investigators couldn't accomplish much on their own in Mexico. FBI agent Lorenzo Perez was able to interview the host of the party that the victims had been at, but he was not allowed to conduct a crime-scene investigation or to collect physical evidence. ROA.1120; ROA.1144. Nor was he able to interview the Mexican officers who responded to the shootings or to seek video footage that had been recorded in Mexico. ROA.1145.

FBI agent Rudy Ortega, who was working as the assistant legal attache at the U.S. consulate in Juarez was similarly limited, hampered by jurisdictional rules and rampant corruption in Mexico. ROA.2069-75; ROA.2083-84. Still, through his efforts, the FBI was able to process four vehicles found in Juarez, one of them a burned Ford Explorer, ROA.2079; ROA.2092, and to bring the bodies of Redelfs and Enriquez to the United States for autopsies. ROA.2083-84; ROA.2306-21. No evidence the agents gathered in Mexico implicated Diaz in the murders. ROA.2090-91; ROA.2103-04.

U.S. agents had known before the consulate murders that the gangs involved in the cartel wars, including Barrio Azteca, communicated among themselves via

radio. The El Paso Intelligence Center (EPIC) had begun monitoring and recording these radio transmissions, and on March 13, 2010, it captured radio calls that seemed to relate to the consulate murders. ROA.1124; ROA.1163; ROA.1177-78; ROA.2097-98. The EPIC recordings contained the voices of men involved in the radio transmissions that day, some of whom were addressed by nickname or number, but the U.S. government did not know to whom the voices belonged. See Gov't Ex. 5 series. Trying to put names to the voices took years and was accomplished through cooperating witnesses.

Three of those cooperating witnesses were men arrested by Mexican law enforcement after the consulate murders: Jesus Chavez Castillo, nicknamed Camello; Miguel Nevarez, nicknamed Lentes; and Alberto Nunez; nicknamed Fresa. ROA.1138. Agent Perez went to Mexico City to interview them. ROA.1137-38. Over the years to come, Perez would interview Camello between 10 and 15 times, but he never recorded the interviews because the FBI does not believe in recording its work. ROA.1160-61. Camello, Nunez, and Nevarez listened to the EPIC recordings and identified voices. ROA.1126-31; ROA.1138-39; ROA.2043-44. Gov't Exs. 5A-I.[3] All testified at Diaz's trial.

_____

[3] Agent Ortega testified that he believed the names assigned by the cooperating witnesses to the voice on the tape were correct based on his experiences of talking after their arrests with those named. Ortega had flown to the United States

These interested witnesses claimed that Diaz, while not a member of Barrio Azteca before 2011, had associated with the gang and had committed crimes with members of the gang. ROA.1330-37; ROA.1948-51;  All three said that he was the gunman referred to as Zorro on the EPIC recordings. ROA.1330-37; ROA.1948-50; ROA.2212-16. All three said Martin Perez Marrufo was the gunman referred to as Popeye. ROA.1330-37; ROA.1948-50; ROA.2212-16.

Camello had pleaded guilty to 12 offenses after the consulate murders, receiving 11 life sentences and a consecutive 10-year sentence. ROA.1190-94. He decided to cooperate with the government in order to receive a safe prison placement, resettlement help for his family who had been attacked after word spread that he was cooperating, and a chance to remain in United States if he were to be released from prison because he received a sentence reduction for his testimony. ROA.1193-97; ROA.1494-1503; ROA.1507.

Camello had led a long and varied criminal life. His conviction in U.S. federal court in 1999 led to him joining Barrio Azteca while he served his sentence at FCI Oakdale. ROA.1199-1200. In prison, Camello helped as Barrio Azteca smuggled drugs into the prison, sold drugs, and shared the money from the drug sales with members on the outside. ROA.1202-04. When he was released from Oakdale and

---

from Mexico when Diaz was extradited and had spoken briefly with him.ROA.2106-07; ROA.2136-37; ROA.2158.

deported, Camello reported to Barrio Azteca in Juarez. ROA.1213. Unlike some members released to the streets in this time of peace, Camello did not work a legitimate job. He sold drugs. Convicted again, he was sent to a Mexican prison where he grew tighter with the gang before being released to begin dealing cocaine. ROA.1190    ROA.1221-22;    ROA.1243-44;    ROA.1266-68;    ROA.1273-74; ROA.1303-07.[4] Camello also worked "security" details and for a time was in charge of the men who were prospects for the gang. ROA.1319-23.

Eventually, Camello's portfolio expanded to removing rival drug sellers from Barrio Azteca territory and then to murder, when he joined the first hit team that Benny set up. That team also included Nunez and Nevarez. ROA.1228-52. The team killed police officers, rival gang members, and sometimes bystanders. ROA.1256-59. When the war came, more hit teams under Benny's direction were created to counter the Sinaloa cartel in Juarez. ROA.1323-26.

About the consulate murders, Camello testified that Benny had been unnerved by a white Honda Pilot that had been driving past his house and sometimes parked

---

[4] In counts Two and Three of the indictment, Diaz was charged with conspiring to possess drugs with the intent to distribute them and with importing drugs into the United States. Barro Azteca and the Juarez cartel were shown to have possessed and imported large quantities of drugs in the years 2007-10. ROA.1708-1804; ROA.1960; ROA.1980-81. The only person who testified that Diaz was directly involved with moving drugs was Camello. He claimed that one week he and Diaz had managed an operation to move marijuana across the river and into the United States using backpackers. ROA.1278-91.

near it. ROA.1382-83. Benny told his people over the radio to be on the lookout for it, and Camello remembered them checking on its license plate when they found it. ROA.1382-84. On March 13, Benny radioed that he had located the white Pilot at a building that held children's birthday parties. He ordered lookouts put on the Pilot and called for Popeye. ROA.1385-86; ROA.1401-04; Gov't Ex. 5C. Nunez, Nevarez, and Zorro all said they were around and could join in the surveillance. ROA.1404-06.

Camello was not involved in the surveillance, but he was listening on his radio at his house as members with radios were supposed to monitor gang communications. ROA.1386; *see also* ROA.1297-1301. Through Camello, the government introduced the radio intercepts of that day and transcripts that had been prepared from the intercepts with Camello's input. Gov't Exs. 5A-I. Camello admitted that, over time, he had spent two full weeks listening to the recording and that he had provided the government names to go with the numbers, nicknames, and voices he heard on the recordings. ROA.1394-99.

It turned out that there were two white SUVs at the party facility. ROA.1386-87. Camello remembered hearing the first SUV that left was being followed by Zorro's team, and the second by Popeye's team. ROA.1387-88.

Camello testified that he heard Zorro report that the SUV he was following could not be the Pilot that Benny had been looking for as it was a Toyota and it,

unlike the Pilot they were looking for, did not have tinted windows. ROA.1388-89; ROA.1407; Gov't Ex. 5E. Benny told Zorro to continue following theToyota. ROA.1388-89. Benny eventually gave an order to kill the occupants of both the Toyota and the Pilot. ROA.1391; ROA.1407-08. Zorro acknowledged the order and said that he would shoot at the Toyota at a traffic light. ROA.1408. Camello heard both Popeye and Zorro report kills; Zorro stated that his occurred near the mayor's office. ROA.1392-93; ROA.1409-10. Camello testified that he met with Zorro later and Zorro told him he had to sit out of the window of his vehicle to shoot across at the Toyota. ROA.1415-16. Camello also testified that he burned the Ford Explorer Popeye had used in his hit on Salcido. ROA.1416-17.

Camello identified Zorro as Diaz and Popeye as Martin Perez. ROA.1330-37. He said he had often heard the two men's voices because they both had Barrio Azteca radios and he had worked with Zorro in several hit team assaults and murders. ROA.1327-42; ROA.1352-61.

Camello identified Chino Valles as a lieutenant in Barrio Aztec in Juarez and stated that Valles handled the gang's communications with the Juarez police and the El Paso gang. ROA.1370-73. He admitted that he had no idea who Chino talked to in El Paso. ROA.1373. He remembered Chino as having been asked to check on the license plate of the unnerving Honda Pilot. The prosecutor pressed Camello for testimony on this issue.

Q: You also remember hearing at some point on the radio Benny instructed Chino to check on a white Pilot with Texas license plates?

A: Yes, sir.

Q: Would that task fall to Chino because it was part of his job?

A: Yes, that was his job.

Q: Was that instruction to check on the license plate for the white Pilot related to the white Pilot they were looking for here?

A: Yes. It was the same one.

ROA.1411-12.

Nunez, a committed and long-time Barrio Azteca member who testified in the hope that his sentence would be lessened, ROA.1932-33; ROA.1937-38, stated that he had worked security and been on hit teams for the gang. ROA.1925-29; ROA.1945-47; ROA.1953; ROA.1963-69; ROA.2025-27; ROA.2052. Like Camello, he was listening to his radio on March 10 when the consulate murders played out. ROA.1929-30; ROA.2000-01. Like Camello, Nunez identified the voice of Zorro on the EPIC recordings of March 13, 2010 as belonging to Diaz. ROA.1948-50; ROA.1986-87; ROA.2003-04.

Nunez explained that a portion of the March 13 recording reflected Zorro telling Benny that the vehicle he was following was not the Pilot, and Benny telling him to kill the occupants anyway. ROA.2008. Zorro then reported over the radio that

13

the job was done. ROA.2009. Nunez remembered talking to Zorro about the killings afterward. ROA.2009-10. ROA.2015. He testified that he had worked with Diaz before and that for a time the two men had even lived at the same safety house in Juarez. ROA.1948-51; ROA.1958; ROA.1971-73.

Miguel "Lentes" Nevarez, a Barrio Azteca member until 2011, had pleaded to 11 crimes including charges related to consulate murders gotten life sentences plus 20 years. ROA.2187-88; ROA.2197. Nevarez became the leader of Barrio Azteca's Valle de Juarez region in 2008 and a sicario a year later. He had been involved in at least 100 killings. ROA.2205-06; ROA.2218. He had decided to cooperate and in return the government brought his mother and nephew to the United States. By the time of trial, his sentence had been reduced to 720 months. ROA.2188-91

Nevarez identified Diaz as Zorro and Perez as Popeye. ROA.2203; ROA.2212-16. He said that he had worked with Diaz and often heard him over the radio. ROA.2212-22. He had also worked with Perez. ROA.2222-27.

On the day of the consulate murders, Nevarez who was without his radio while shopping, was called by Perez who requested his help. ROA.2229-30. Nevarez drove to the party hall facility. He saw a couple leave the building and get into a white SUV. ROA.2231-32. He followed the SUV, and he described the man in it to Benny over the radio; he heard Zorro say he was close by and heard Zorro tell Benny the Toyota was not the right car and the man in the car was not who they were seeking. Benny

ordered the vehicle hit anyway. ROA.2232-40. Nevarez used the car he was driving to help box in the Toyota at a traffic light. Zorro shot at the occupants of the car. ROA.2235-37; ROA.2250-51.

After the jury returned its verdict, a probation officer prepared and revised a presentence report. The probation officer recommended a total offense level of 43, and a criminal history category of I for Diaz. These numbers produced an advisory guidelines sentence range of life imprisonment. ROA.2702. The report stated that the sentences on Counts Six, Seven, and Eight under 18 U.S.C. § 924(j) carried a mandatory minimum term of 10 years imprisonment that had to run consecutively to the other sentences. ROA.2707 (citing 18 U.S.C. § 924(c) and U.S.S.G. §2K2.4(b)).

At sentencing, the district court adopted the presentence report. ROA.2613. The court sentenced Diaz to 240 months' imprisonment on the money laundering conviction and to life imprisonment on each of the counts. ROA.2611-12; *see also* ROA.727 (written judgment). The court ordered that all the sentences run concurrently to each other, except for the life sentences on Counts 6, 7, and 8, which were ordered to run consecutively. ROA.2611-12; *see also* ROA.727.

## SUMMARY OF THE ARGUMENTS

**I. The Evidence Was Insufficient to Support the Conviction on Count Five for Conspiracy to Murder in a Foreign Country.**

To prove the offense of conspiracy to murder in a foreign country, the government must prove the existence of an agreement to murder and the presence in the United States of one of the acting conspirators. The government failed to do so.

The government's evidence showed that a member of the Barrio Azteca gang in Juarez, Mexico, had been told to contact someone in the United States to check on a Texas license plate on a white Honda Pilot. No evidence showed the contact was made. No evidence showed that, if the contact were made, the person who answered the call had a discussion with the person in Juarez about the license plate. Most importantly legally, no evidence showed that unidentified person in the United States who might have answered a call that might have been placed had knowledge of an agreement to murder someone in Mexico and had voluntarily joined the agreement to murder. On top of all that, the murders in this case did not even involve a white Honda pilot with a Texas license plate.

The government did not prove that a person within the jurisdiction of the United States joined a conspiracy to murder in Mexico and had done an act in the United States. The government simply invited the jury to pile inference upon inference and speculate about what might have possibly happened. The Court's

precedent is clear that a conviction needs to rest on evidence, not speculation. The conviction on Count Five does not so rest. It must be reversed.

## II. The Evidence Was Insufficient to Support the Convictions on Counts Eight and Eleven for Aiding and Abetting the Murder of Salcido.

Diaz was convicted of aiding and abetting the murder of Jorge Salcido by firearm during a drug-trafficking crime or crime of violence. He was also charged with aiding and abetting the murder of Jorge Salcido in aid of racketeering. The evidence did not support the convictions.

The evidence was undisputed that Martin Perez shot and killed Salcido. To prove that Diaz aided and abetted that murder, the government had to prove that he shared Perez's intent and that he took an affirmative action toward making the murder succeed. It failed to do so. Perez operated independently of Diaz. Each of the men had his own crime to commit. The only connection between them was that they spoke to the same gang leader on the radio. That they shared a radio frequency, but not advice or actions, was not enough. Diaz did not take an affirmative action to advance Perez's murder of Salcido. The convictions on Counts Eight and Eleven must therefore be reversed.

### III. The Consecutive Life Sentences on Counts Six, Seven, and Eight Were Not Required by Statute.

The district court sentenced Diaz to life terms of imprisonment on Counts Six, Seven and Eight and ordered the terms to run consecutively to the other sentences imposed. Those counts were convictions under 18 U.S.C. § 924(j) for using a firearm to commit murder during the course of a drug-trafficking offense or crime of violence. The district court acted under the belief that under § 924(c) sentences for § 924(j) convictions were required to be consecutive to all other sentences.

The district court was mistaken. Section 924(j) creates an offense separate from the offense denounced by § 924(c) and it provides its own sentences for the separate offense it creates. The plain language of § 924(j) does not require a consecutive sentence. The plain language of § 924(j) does not incorporate the consecutive-sentence requirement of § 924(c).

No consecutive sentences were required. When sentencing under § 924(j), a court may run sentences concurrently or consecutively at its discretion. Because the district court in this case believed that consecutive sentences were required, Diaz's sentences on Counts Six, Seven, and Eight should be vacated and the case should be remand for resentencing.

## ARGUMENTS AND AUTHORITIES

I.    **The Evidence Was Insufficient to Support the Conviction on Count Five for Conspiracy to Murder in a Foreign Country.**

Count Five of the indictment charged that Diaz had conspired with others to murder Enriquez, Redelfs, and Salcido in a country outside the United States. ROA.315-16. That charged required proof that one of the conspirators was in the United States and did an act during the conspiracy. The evidence failed to show that a person who had joined an agreement to murder was in the United States. The conviction must therefore be reversed.

### A. Standard of review.

The government must prove each element of a charged offense beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364 (1970). This Court reviews the evidence, in the light favorable to the government, and then decides whether a rational jury could have found that each offense element had been proved beyond a reasonable doubt. *United States v. Daniels,* 723 F.3d 562, 569 (5th Cir. 2013); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).

### B. The government did not prove that anyone in the United States had knowingly joined an agreement to kill Enriquez, Redelfs, and Salcido .

Title 18 U.S.C. § 956 criminalizes conspiring to kill a person in a foreign country. To obtain a obtain a conviction under § 956, the government must prove four elements. They are: (1) the defendant agreed with at least one person to commit

19

murder; (2) the defendant willfully joined the agreement with the intent to further its purpose; (3) during the existence of the conspiracy, one of the conspirators committed at least one overt act in furtherance of the object of the conspiracy; and (4) at least one of the conspirators was within the jurisdiction of the United States when the agreement was made. *United States v. Fernandez,* 559 F.3d 303, 325 (5th Cir. 2009); *United States v. Wharton,* 320 F.3d 526, 537-38 (5th Cir. 2003). In this case, the government did not prove the necessary elements. No evidence showed that any conspirator–that is a person who had agreed to participate in murder and took an action–was in the United States. *See United States v. Fernandez,* 559 F.3d 303, 327 (5th Cir. 2009) (evidence showed that agreement to murder was reached by a person present in El Paso who did overt act).

The government's evidence in Diaz's case failed to identify any person in the United States who knew of an agreement to murder and voluntarily joined that agreement with the intent to make it succeed. *Cf. Wharton,* 320 F.3d at 537-38; *Fernandez,* 559 F.3d at 327. *Wharton* nicely illustrates the requirement of having a conspirator in the United States.

Wharton and Judy Nipper worked for an insurance company in Louisiana. They learned of a scheme in which life insurance policies would be purchased on a person and then the purchaser would travel to Haiti to obtain a false Haitian death certificate for the insured in order to collect on the policies. *Wharton,* 320 F.3d at

528-29. Wharton then began dating a woman named Shelia Webb. He and Nipper told Webb about the fake-death scheme and the group bought policies on Webb's life. Wharton and Webb told a family member that "they had found someone who could "`furnish them with a body.'" *Id.* at 529. Wharton, Webb, and Nipper continued to purchase policies from May 1998 to October 1999, eventually accumulating over $2 million in life insurance coverage on Webb. The beneficiaries included Wharton and Nipper. *Id.* at 529, 537-38. In January 2000, Wharton and Webb traveled to Haiti. Nipper three times wired money to Wharton while he was in Haiti. Webb was shot to death on an isolated road outside of Port–Au–Prince following what Wharton described as a carjacking. The murder occurred one day after Nipper made the last transfer of money. Two days after Webb's death, a Haitian man Wharton had been working with deposited $7,000 in cash he had received from Wharton into a Haitian bank. *Id.* at 530. This Court found that the evidence of Nipper's actions in the United States sufficed to show that the conspiracy included a conspirator who had taken an action in the United States. *Id.* at 537-38.

*Fernandez* also involved a conspirator who reached an agreement to murder and who was present and acted in the United States. The Court found that the evidence allowed the jury to conclude that the event that marked the creation of the conspiracy to murder occurred in El Paso, Texas, and thus within the jurisdiction on the United States. 559 F.3d at 328.

Nothing like this evidence was presented in Diaz's case. Camello testified that Benny had put a lookout on a white Pilot that had been passing by his house. ROA.1382-83. At some later point Benny told Chino Valles call El Paso to ask about a white Honda Pilot with Texas plates. ROA.1410-11[5] The evidence did not show that the contact was made by Chino. Indulging the government's "sacred rules" theory that an order must be followed, *see* ROA.1424, ROA.1850, it would be a reasonable inference that Chino Valles at least tried to call to El Paso. But there is no evidence that the contact was successful. And inferring that the call might have gone through, there is no evidence of whom the person was who might have received the call. Most critically, there is no evidence that the person who might have been reached out to by Chino Valles knew of a conspiracy to murder, agreed to participate in the conspiracy, and took an overt act in the United States after joining in the conspiracy.

The Court has long held that "[p]roof of an agreement to enter a conspiracy is not to be lightly inferred," *see, e.g., United States v. Ganji,* 880 F3d 760, 767 (5th Cir. 2018); *United States v. Johnson,* 439 F.2d 885, 888 (5th Cir. 1971) and that a conspiracy cannot be established by piling "inference upon inference," *see, e.g.,*

---

[5] The evidence showed that Salcido's white Honda Pilot had Mexican license plates. ROA.2344; ROA.3753. It is therefore clear that it is impossible that the order Benny gave to Chino Valles involved Salcido's car. There is no evidence at all that anyone was asked to investigate the Toyota owned by Enriquez and Redelfs.

*United States v. Crain,* 33 F.3d 480, 487 (5th Cir. 1993) and *United States v. Onick,* 889 F.2d 1425, 1429 (5th Cir. 1989). A jury may make fact-based, but "a verdict may not rest on mere suspicion, speculation or conjecture, or on an overly attenuated piling of inference on inference." *United States v. Rojas-Alvarez,* 451 F.3d 320, 334 (5th Cir. 2006) (quoting *United States v. Pettigrew,* 77 F.3d 1500, 1521 (5th Cir. 1996)).

The Court examines the evidence in each case "independently" to assess the "merits" of the individual case. *Onick,* 889 F.2d at 1429. This is important to every defendant, but is particularly important in this case, for below, in opposing Diaz's motion for a judgment of acquittal, the government relied on the unpublished case of *United States v. Castrellon,* 636 Fed. Appx. 204 (5th Cir. 2016). Diaz anticipates the government may also try to rely on appeal, but that reliance will be misplaced.

It's true that *Castrellon* affirmed Benny's conviction for conspiracy to murder in a foreign country, but each case must be decided on its own evidence. *Onick,* 889 F.2d at 1429. Two big differences exist between the individual cases, Castrellon's and Diaz's, the standard of review and the evidence presented.

Benny did not renew his motion for a judgement of acquittal. *United States v. Castrellon,* 636 Fed. Appx. 204 (5th Cir. 2016). That failure by his counsel meant that this Court reviewed the sufficiency of the evidence supporting Benny's conspiracy conviction under the devoid-of-evidence test. *Id.* at 206. As its name

suggests, the devoid-of-evidence test does ask much of the government's evidence. In this case, Diaz's made a timely motion for judgment of acquittal. ROA.2357-69. His case is therefore reviewed de novo under the *Jackson* standard. That standard requires proof of each element of an offense beyond a reasonable doubt. Under that standard, his conviction must be reversed.

The evidence in this case was different from that presented in *Castrellon,* In *Castrellon,* Camello had testified that that "he heard [Benny] order Valles to call the El Paso Aztecas" to find out who a white Honda Pilot with Texas license plates might belong to. 636 Fed. Appx. at 206. That's not what Camello testified to in Diaz's case. Camello testified that Benny put out a lookout for a  Pilot that had been seen in his neighborhood and that Chino was told to check on a white Honda Pilot with Texas license plates. ROA.1382-84; ROA.1411-12. But Salicido's white Pilot, had Mexican license plates. ROA.2344; ROA.3753. It is therefore clear that it is impossible that the order Benny gave to Chino Valles to check on a white Pilot with Texas plates involved Salcido's car. No one would check Texas records for a Mexican license plate registration.

Three points stand out: First, in *Castrellon,* there was apparently no evidence about the license plate on Salcido's car. The Court could, under the devoid-of-evidence test, assume the jury had been reasonable in believing that the order to Chino Valles related to Salcido's car. That is not possible here, and it is critical when

reviewing the evidence under the *Jackson* standard. Second, *Castrellon* relied on testimony that "according to [Camello], calls to the El Paso branch about hits were not unusual." 636 Fed. Appx. at 207. No such testimony was given by Camello in this case. Third, the indulgences the *Castrellon* court gave the government's evidence under the devoid-of-evidence test do not apply under the *Jackson* test. Under that test, it is important that a conviction does not rest on inference piling or speculation. *Onick,* 889 F.2d at 1429; *Crain,* 33 F.3d at 437; *Pettigrew,* 77 F.3d at 1521. This conviction does. No evidence shows the existence of a person in the United States who knowingly joined a conspiracy to murder and did an over act in the United States. Only speculation can allow that conclusion on this record.

The government failed to prove an act by a conspirator who was in the United States. The conviction must be reversed.

## II.    The Evidence Was Insufficient to Support the Convictions on Counts 8 and 11 for Aiding and Abetting the Murder of Salcido .

Diaz was convicted on Count Eight of aiding and abetting the murder of Jorge Salcido by use of a firearm during a crime of violence of drug-trafficking crime, in violation of 18 U.S.C. § 924(j). He was convicted on Count Eleven of aiding and abetting the murder of Salcido as part of a crime in aid of racketeering. The evidence does not support those convictions. Perez killed Salcido, in a different part of Juarez than Diaz was in. Diaz did not take steps to help Perez in the Salcido murder. The convictions on Counts Eight and Eleven must be reversed.

**A. Standard of review.**

The Court reviews the evidence, in a light favorable to the government, to determine whether a rational jury could have found that each offense element had been proved beyond a reasonable doubt. *Daniels,* 723 F.3d at 569); *Jackson,* 443 U.S. at 317-19.

**B. The evidence was insufficient to prove Diaz aided and abetted the murder of Salcido.**

Count Eight charged Diaz with aiding and abetting the murder of Jorge Salcido in violation of 18 U.S.C. § 924(c). ROA.321-22. Section 924(j) makes it a crime to murder by use of a firearm during and in relation to a § 924(c) crime of violence. To obtain a conviction on an aiding-and-abetting theory, the government must show that "the elements of the substantive offense occurred, and that the defendant associated with the criminal venture, purposefully participated in the criminal activity, and sought by his actions to help it succeed." *United States v. Mitchell,* 792 F.3d 581, 583 (5th Cir. 2015). Aiding and abetting is not shown by proof "that a defendant was merely associated with a criminal" or even by proof "that [he] was present at the scene of a crime[.]" *United States v. Portillo,* 969 F.3d at 164 (quoting *United States v. Longoria,* 569 F.2d 422, 425 (5th Cir. 1978)). To prove a defendant aided and abetted the offense, the government must show that the accused "(1) [took] an affirmative step in furtherance of that offense, (2) with the

intent of facilitating the offense's commission." *Portillo,* 969 F.3d at 164 (quoting *Rosemond v. United States,* 572 U.S. 65, 71 (2014)).

Diaz did not murder Salcido. That is clear from the evidence. Martin Perez murdered Salcido, shooting him dead. Diaz was not at the scene of the murder. Participation requires a showing of an affirmative act that assisted in the success of the venture. *Id.* The evidence did not show Diaz committed such an act.

Obviously, the jury could not convict Diaz because he was associated with Barrio Azteca or Perez. Allowing Diaz's conviction to stand because he was an associate of Perez would elide the requirement of proof of individual guilt beyond a reasonable doubt and "would 'smack[ ] of guilt by association" *United States v. Garcia,* 151 F.3d 1243,1246 (9th Cir. 1998) (quoting  *Mitchell v. Prunty,* 107 F.3d 1337, 1342 (9th Cir. 1997)). An affirmative act in support of the murder had to be shown. None was. Diaz was not with Perez as Perez followed and shot Salcido. Diaz did not supply Perez with the weapon used to shoot Salcido. Nor did he provide the car in which Perez followed Salcido and from which he shot Salcido.

Diaz was talking on the radio frequency used by Barrio Azteca around the same times as Perez was, but that was not an affirmative act to advance Perez's murder of Salcido. Diaz was not advising or assisting Perez. Diaz was discussing his own chase and his own shooting. Because no evidence shows that Diaz took an

affirmative act to facilitate Salcido's murder by Perez, the conviction on Count Eight must be reversed.

### C. The evidence was insufficient to prove Diaz aided and abetted the murder of Salcido in violation of VICAR.

Count Eleven charged Diaz with aiding and abetting the murder of Jorge Salcido with the intent to further or maintain a position in a racketeering enterprise, in violation of 18 U.S.C. § 1959(a)(1). ROA.326. To prove murder in support of a racketeering enterprise charge under a § 1959(a)(1), the government must show "(1) an enterprise engaged in racketeering; (2) the activities affected interstate commerce; (3) a murder; and (4) the murder was committed for payment by the enterprise or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise." *Portillo,* 969 F.3d at 164. To prove a defendant aided and abetted the murder the government must show that the accused "(1) [took] an affirmative step in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Id.* (quoting *Rosemond v. United States,* 572 U.S. 65, 71 (2014)). Aiding and abetting is not shown by proof "that a defendant was merely associated with a criminal" or by proof "that [he] was present at the scene of a crime[.]" *Portillo,* 969 F.3d at 164 (quoting *United States v. Longoria,* 569 F.2d 422, 425 (5th Cir. 1978)).

The evidence was insufficient to support the conviction on Count Eleven. At most, the evidence showed that Diaz was associated with the Barrio Azteca and with

Martin Perez who murdered Salcido. The evidence showed Diaz was not the one who murdered Salcido. Perez was.

The evidence did not prove that Diaz aided and abetted Perez's murder of Salcido. Diaz was not with Perez. Diaz did not provide Perez with a weapon. Diaz did not provide Perez with a vehicle. Diaz did not provide Perez with directions to Salcido. Diaz simply talked on a radio frequency used the Barrio Azteca that Perez also talked on. That was not an affirmative act assisting Perez's murder of Salcido. The conviction on Count Eleven must be reversed.

### III. The Consecutive Life Sentences on Counts Six, Seven, and Eight Were Not Required by Statute.

Diaz was convicted under 18 U.S.C. § 924(j) of the murders of Enriquez, Redelfs, and Salcido. At sentencing, the district court adopted the presentence report, which stated that the sentences on the § 924(j) convictions had to be run consecutively to any other sentence imposed. ROA.2613; ROA.2707. The court then imposed consecutive life sentences on those counts. ROA.2612; ROA.727.

The plain language of § 924(j) does not require that sentences for that offense be consecutive to any other sentence. Because the district court-imposed sentence on the § 924(j) counts under a misunderstanding that § 924(j) did require consecutive

sentences, the sentences on Counts Six, Seven, and Eight should be vacated and the case should be remanded for resentencing.[6]

**A. Standard of review.**

The Court reviews the meaning and interpretation of a statute de novo. *United States v. Torres,* 8 F.4th 413, 415 (5th Cir. 2021); *United States v. Salazar,* 542 F.3d 139, 144 (5th Cir. 2008). However, Diaz did not object to the imposition of consecutive sentences on Counts Six, Seven, and Eight and thus review in his case is for plain error. A plain error is one that is clear or obvious and that affects a defendant's substantial rights. *United States v. Blanco,* 27 F.4th 375, 380 (5th Cir. 2022). A plain error affecting substantial rights may be corrected when it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.*

**B. Section 924(j) does not require consecutive sentences.**

Section 924(j) provides that "[a] person who, in the course of a violation of subsection [924](c), causes the death of a person through the use of a firearm, shall . . . (1) if the killing is a murder (as defined in section 1111) be punished by death or by imprisonment for any term of years or for life." Section 924(j) draws some of its elements from section 924(c) and some of its elements from 18 U.S.C. § 1111.

---

[6] The Supreme Court heard argument on whether § 924(j) requires consecutive sentences on March 28, 2023, in *United States v. Lora.* The decision in *Lora* is likely to control the outcome of this issue presented by Diaz.

30

The elements of subsection 924(c) that subsection 924(j) incorporates are using or carrying a firearm during or in relation to a crime of violence or drug trafficking crime. From § 1111, § 924(j) draws the definitional elements of murder.

The crime subsection (j) denounces carries a maximum sentence of death. That is greater than the maximum sentence authorized by the penalty provision for the offense denounced by § 924(c).[7] These characteristics–additional elements and separate penalties–make § 924(j) an offense separate and distinct from the offense denounced by § 924(c). *Cf. Apprendi v. New Jersey,* 530 U.S. 466 (2000); *Alleyne v. United States,* 570 U.S. 99 (2013); *United States v. Julian,* 633 F.3d 1250, 1253-57 (11th Cir. 2011); *United States v. Gonzalez,* 841 F.3d 339 (5th Cir. 2016).

---

[7] This Court addressed a different issue involving the interaction of § 924(j) and § 924(c) in *United States v. Gonzalez,* 841 F.3d 339 (5th Cir. 2016). There, the defendant had been convicted of both the use and carry of a firearm during a drug-trafficking offense, in violation of section 924(c), and firearm murder in relation to a drug-trafficking offense, in violation of section 924(j). The question presented was whether the Double Jeopardy Clause permitted a defendant to be sentenced for both offenses. The Court decided that it did not. Sections 924(c) and 924(j) denounce separate offenses, though their elements may overlap (Section 924(j), obviously has an additional element). The sections contain separate and distinct punishment language. *Gonzalez* teaches that, when the government has charged both a § 924(j) and § 924(c) offense, the Double Jeopardy Clause requires election of punishment. In such circumstances, perhaps the government would elect to choose the consecutive punishment under § 924(c). However, when, as here, the government has charged only a § 924(j) offense, punishment must be assessed according to the plain language of subsection (j). Under § 924(j), no consecutive sentence is required.

The distinct offense created by § 924(j) contains its own penalty provision. It does not incorporate the penalty provisions of either § 924(c) or § 1111, not as to the range of punishment and, critically, not as to the way a sentence imposed for a § 924(j) offense must be served. The plain language of § 924(j), unlike the punishment language of § 924(c), does not contain a requirement of a consecutive sentence. Instead, § 924(j) simply states what sentences are available. This absence is telling. Had Congress wished to provide a mandatory consecutive sentence for a § 924(j) offense, it would have done so. It did not.

Had Congress wished to incorporate by reference the consecutive penalty provision of subsection § 924(c), it would have done so. It did not. Obviously, Congress knew how to do so—it had incorporated elements of the offense defined by § 924(c) offense into the offense defined by § 924(j). That Congress did not incorporate the penalty provisions of § 924(c) into § 924(j) shows that it did not mean to.[8]

The plain language of § 924(c) also shows that the consecutive-sentence requirement does not apply to § 924(j). Section 924(c) specifically states that its

---

[8] The rule that the expression of one thing implies the exclusion of others (*expressio unius est exclusion alterius*) favors a reading that § 924(c)'s consecutive-sentence requirement has not been incorporated into § 924(j). *See Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980). Congress brought parts of § 924 (c) into § 924(j). That is did not bring other parts counsels against the courts reading them not § 924(j).

consecutive-sentence requirement applies to sentences "imposed … under *this subsection*[.]" 18 U.S.C. § 924(c)(1)(D)(ii) (emphasis added). The referent of "this" is clear. It is the subsection in which the word occurs–§ 924(c). "This" does not mean "some other" subsection. It means the subsection in which the direction occurs, the one immediately under discussion,  subsection (c). *Cf. Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60–61 (2004) (discussing structures of sections and subsections). Finally, subsection 924(c) uses the phrase "this subsection" multiple times. The only way to read "this subsection" consistently and coherently is for it to mean subsection (c),  and  only subsection  (c). *See* 18 U.S.C. § 924(c)(1)(A), (c)(1)(B),  (c)(1)(C),  (c)(1)(D)(i), (c)(1)(D)(ii), (c)(2), (c)(3), (c)(4), (c)(5).

Other statutes show that, when Congress wishes a consecutive-sentence requirement to apply across an entire statutory section, it so states. For example, in mandating consecutive sentences for acts of terrorism transcending national boundaries, Congress stated "nor shall the term of imprisonment imposed under this section run concurrently with any other term." 18 U.S.C. § 2332b(c)(2). Similarly, in punishing aggravated identify theft Congress forbade concurrent sentences upon conviction under "this section." 18 U.S.C. § 1028A(b)(2).

A sentence imposed under subsection (j) is not a sentence imposed under subsection (c), so the consecutive-sentences requirement does not apply. Because it is not, consistent with the common law rule and with 18 U.S.C. § 3584, which

codified that rule, a sentence under subsection (j) may run consecutively or concurrently at the discretion of the sentencing judge. *Cf. Oregon v. Ice*, 555 U.S. 160, 168 (2009) (tracing the history of the common law rule) The district court therefore erred by acting as though § 924(j) required consecutive sentences.

If the Supreme Court finds that § 924(j) does not require consecutive sentences, the district court's error will be plain. *Henderson v. United States,* 568 U.S. 266 (2013). That plain error obviously affects Diaz substantial rights. The consecutive life sentences increase his imprisonment sentence and adversely affect his classification in the Bureau of Prisons. The district court's imposition of consecutive life sentences under the erroneous belief that they were required also affects the fairness and reputation of the proceeding. Our country has a long history of judicial discretion in the imposition of consecutive or concurrent sentences. To have Diaz sentenced to consecutive terms of life without the exercise of judicial discretion contemplated by Congress and our criminal justice system, undermines the fairness, integrity and public appearance of the proceeding that imposed the sentence. The sentences on Counts Six, Seven and Eight should be vacated. .

## CONCLUSION

For these reasons, Diaz asks that the Court reverse the convictions on Counts Five, Eight, and Eleven and. and vacate the sentences on Counts Six and Seven.

Alternatively, Diaz asks that the Court vacate the sentences on Counts Six, Seven, and Eight.

Respectfully submitted.

By:   */s/ Philip J. Lynch*
          Law Offices of Phil Lynch
          17503 La Cantera Parkway
          Suite 104-623
          San Antonio, Texas 78257
          Tel.: (210) 378-3114
          LawOfficesofPhilLynch@satx.rr.com

          Attorney for Defendant-Appellant

## CERTIFICATE OF SERVICE

I certify that, on April 10, 2023, I electronically filed this Brief with the Clerk of Court using the CM/ECF system, which will send notification of such filing to Assistant U.S. Attorney Joseph H. Gay Jr. and to Leonard Morales via electronic mail.

By:   */s/ Philip J. Lynch*
          Attorney for Defendant-Appellant

## ECF CERTIFICATION

I certify that: 1) required privacy redactions have been made; 2) the electronic submission is an exact copy of the paper document; and 3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

35

By:    */s/ Philip J. Lynch*
       Attorney for Defendant-Appellant

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

    ● this brief contains 8,078 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii), *or*

    ○ this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by FED.
    R. APP. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP.P. 32(a)(6) because:

    ● this brief has been prepared in a proportionally spaced typeface using WORD in Times New Roman 14 pt., *or*

    ○ this brief has been prepared in a monospaced typeface using _____ with _____.

/s/ Philip J. Lynch

Attorney for Jose Diaz Diaz, Appeal No. 22-50951

Dated: April 10, 2023