# No. 22-50951

# In the United States Court of Appeals for the Fifth Circuit

————————————

### No. 22-50951

### UNITED STATES OF AMERICA,
Plaintiff-Appellee,

**v.**

### JOSE GUADALUPE DIAZ DIAZ,
Defendant-Appellant.

consolidated with

### No. 22-50956

### UNITED STATES OF AMERICA,
Plaintiff-Appellee,

**v.**

### MARTIN PEREZ MARRUFO,
Defendant-Appellant.

————————————

On Appeal from the United States District Court
for the Western District of Texas

————————————

### APPELLEE'S CONSOLIDATED BRIEF
### FOR THE UNITED STATES OF AMERICA

————————————

JAIME ESPARZA
United States Attorney

ELIZABETH BERENGUER
Assistant United States Attorney
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7090

ATTORNEYS FOR APPELLEE

## STATEMENT REGARDING ORAL ARGUMENT

The government submits that oral argument is unnecessary in this case. The two defendant-appellants raise numerous issues on appeal following their conviction by a jury after a two-week trial. Despite the size of the record, the issues can be resolved based solely on established precedent, the record, and the due deference this Court gives to a jury's verdict and a sentencing court's factual findings. The briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the decisional process. *See* Fed. R. App. P. 34(a)(2)(C); 5th Cir. R. 28.2.3.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ....................................i

LIST OF AUTHORITIES.........................................................iv

JURISDICTION ....................................................................1

STATEMENT OF THE ISSUES..................................................1

STATEMENT OF THE CASE ..................................................2

A.  The Barrio Azteca....................................................3

B.  The Defendants' Role in the Aztecas ............................4

C.  Cross-border Cooperation During the Cartel War ..........5

D.  The Consulate Murders ...........................................7

E.  Investigation........................................................11

F.  Trial & Sentencing ................................................12

SUMMARY OF THE ARGUMENTS .......................................15

ARGUMENTS ....................................................................16

1.  Sufficient Evidence Supports the Defendants' Convictions for Conspiracy to Commit Murder in a Foreign Country. ..................16

   A. Standard of Review ...............................................16

   B. Argument............................................................17

2.  The Record Is Not Devoid of Evidence Supporting the Jury's Verdict on Counts 8 And 11, Relating to the Murder of Jorge Salcido. ...........................................................23

   A. Standard of Review ...............................................23

   B. Argument............................................................24

3.  The District Court Did Not Clearly Err in Applying the Obstruction-of-Justice Adjustment under USSG § 3C1.1.............31

    A. Relevant Facts.............................................................31

    B. Standard of Review ..................................................32

    C. Argument.................................................................33

4.  The Court Should Vacate Diaz's Consecutive Life Sentences Imposed for His § 924(j) Convictions Consistent with the Supreme Court's Recent Decision in *Lora v. United States*..........36

    A. Standard of Review ...............................................36

    B. Argument................................................................37

CONCLUSION ......................................................................38

CERTIFICATE OF SERVICE.................................................39

CERTIFICATE OF COMPLIANCE.........................................39

# LIST OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Henderson v. United States,*
    568 U.S. 266 (2013)..................................................................37

*Lora v. United States,*
    143 S. Ct. 1713 (2023)...........................................................2, 37

*Pereira v. United States,*
    347 U.S. 1 (1954)......................................................................26

*Rosemond v. United States,*
    572 U.S. 65 (2014)..............................................................26, 29

*United States v. Ahmed,*
    324 F.3d 368 (5th Cir. 2003)..................................................32

*United States v. Bell,*
    812 F.2d 188 (5th Cir. 1987)..............................................26, 29

*United States v. Cabello,*
    33 F.4th 281 (5th Cir. 2022).................................................16

*United States v. Caldwell,*
    16 F.3d 623 (5th Cir. 1994)....................................................21

*United States v. Carbins,*
    882 F.3d 557 (5th Cir. 2018)..................................................25

*United States v. Castrellon,*
    636 F. App'x 204 (5th Cir. 2016) ...........................17, 21, 22

*United States v. Concepcion,*
    983 F.2d 369 (2d Cir. 1992)...................................................29

*United States v. Delgado,*
    672 F.3d 320 (5th Cir. 2012) (en banc).................................23

*United States v. Fernandez,*
    559 F.3d 303 (5th Cir. 2009)..................................................20

*United States v. Foster,*
    507 F.3d 233 (4th Cir. 2007)..................................................25

*United States v. Gonzales,*
  841 F.3d 339 (5th Cir. 2016)................................................................27

*United States v. Green,*
  293 F.3d 886 (5th Cir. 2002)...............................................................23

*United States v. Hankton,*
  51 F.4th 578 (5th Cir. 2022) ...............................................................25

*United States v. Hansen,*
  143 S. Ct. 1932 (2023).........................................................................26

*United States v. Hawkins,*
  866 F.3d 344 (5th Cir. 2017)...............................................................32

*United States v. Hernandez,*
  48 F.4th 367 (5th Cir. 2022) ...............................................................33

*United States v. Herrera,*
  313 F.3d 882 (5th Cir. 2002) (en banc)..............................................23

*United States v. Malone,*
  828 F.3d 331 (5th Cir. 2016)...............................................................33

*United States v. Mauskar,*
  557 F.3d 219 (5th Cir. 2009)...............................................................16

*United States v. McDowell,*
  498 F.3d 308 (5th Cir. 2007)...............................................................23

*United States v. Nava,*
  957 F.3d 581 (5th Cir. 2020)...............................................................36

*United States v. Olano,*
  507 U.S. 725 (1993).............................................................................37

*United States v. Pennington,*
  20 F.3d 593 (5th Cir. 1994).................................................................16

*United States v. Portillo,*
  969 F.3d 144 (5th Cir. 2020)...............................................................18

*United States v. Read,*
  710 F.3d 219 (5th Cir. 2012)...............................................................20

*United States v. Rodriguez-Mireles,*
   896 F.2d 890 (5th Cir. 1990) ............................................... 16

*United States v. Rommy,*
   506 F.3d 108 (2d Cir. 2007) ................................................. 21

*United States v. Sampol,*
   636 F.2d 621 (D.C. Cir. 1980) .............................................. 30

*United States v. Shows Urquidi,*
   71 F.4th 357 (5th Cir. 2023) ......................................... 18, 25

*United States v. Stubblefield,*
   942 F.3d 666 (5th Cir. 2019) ............................................... 35

*United States v. Vaden,*
   912 F.2d 780 (5th Cir. 1990) ............................................... 29

*United States v. Vargas-Ocampo,*
   747 F.3d 299 (5th Cir. 2014) (en banc) ............................... 16

*United States v. Vasquez,*
   677 F.3d 685 (5th Cir. 2012) ............................................... 20

*United States v. Warren,*
   986 F.3d 557 (5th Cir. 2021) ............................................... 36

*United States v. Wharton,*
   320 F.3d 526 (5th Cir. 2003) ............................................... 17

*United States v. Zamora-Salazar,*
   860 F.3d 826 (5th Cir. 2017) ............................................... 16

**Statutes**

18 U.S.C. § 2 ................................................................. 12, 24, 25

18 U.S.C. § 924(c) ...................................................... 2, 12, 24, 37

18 U.S.C. § 924(j) .................................................................. passim

18 U.S.C. § 956(a)(1) ...................................................... 1, 12, 17

18 U.S.C. § 1956 ...................................................................... 11

18 U.S.C. § 1959(a)(1)..............................................................1, 12, 24

18 U.S.C. § 1962(d)........................................................................11

18 U.S.C. § 3742 ...............................................................................1

21 U.S.C. § 841................................................................................11

21 U.S.C. § 846................................................................................11

21 U.S.C. § 952................................................................................11

21 U.S.C. § 960................................................................................11

21 U.S.C. § 963................................................................................11

28 U.S.C. § 1291 ...............................................................................1

## Other Authorities

Black's Law Dictionary (11th ed. 2019)....................................27

USSG § 3C1.1 .........................................................2, 33, 34

USSG Ch. 5, Pt. A, comment. 2...................................................36

## Rules

Fed. R. Crim. P. 52(a)..................................................................36

## Treatises

Jens David Ohlin, 1 *Wharton's Criminal Law* § 10:11 (16th ed. Sept. 2022 Update), Westlaw CRIMLAW § 10.11.......................................26

Wayne R. LaFave, 2 *Substantive Criminal Law* § 13.2(a) (3d ed. Oct. 2022 update), Westlaw SUBCRL § 13.2(a) ..........................................26

# JURISDICTION

This is a consolidated appeal from a district court's final judgment in a federal criminal case. The district court had jurisdiction under 18 U.S.C. § 3231. Both defendants filed timely notices of appeal. (ROA.734-35, 744-45; ROA.22-50956.728-29.) This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

This appeal arises from the convictions of Defendants-Appellants Jose Guadalupe Diaz-Diaz and Martin Perez Marrufo for crimes related to their participation in the Barrio Azteca criminal organization and their involvement in the assassination of a U.S. consulate employee and consulate employee family members in Mexico.

1.    Was the evidence sufficient to support the jury's verdict for conspiracy to commit murder in a foreign country, in violation of 18 U.S.C. § 956(a)(1)? (Diaz Issue 1, Perez Issue I)

2.    Evidence at trial showed the Aztecas set out to murder the passengers of a white SUV, but they found two similar SUVs at the location. Diaz's hit team followed and killed the occupants of one SUV, while a second team followed and killed Jorge Salcido in the other SUV. Was the record devoid of evidence supporting the jury's verdict that Diaz aided and abetted Salcido's murder, in violation of 18 U.S.C. § 924(j) (Count 8) and 18 U.S.C. § 1959(a)(1) (Count 11)? (Diaz Issue 2)

1

3.     Did the district court clearly err when it imposed an obstruc-tion-of-justice adjustment under USSG § 3C1.1? (Perez Issue II)

4.     While this appeal was pending, the Supreme Court held in *Lora v. United States*, 143 S. Ct. 1713 (2023), that 18 U.S.C. § 924(c)(1)(D)(ii)'s mandatory consecutive sentence does not extend to a sentence imposed under 18 U.S.C. § 924(j). Did the district court plainly err when it imposed mandatory consecutive life sentences for Diaz's three § 924(j) convictions? (Diaz Issue 3)

## STATEMENT OF THE CASE

In March 2010, Azteca sicarios Diaz and Perez were ordered to kill the occupants of a white Honda Pilot with Texas license plates that Az-teca leaders believed belonged to a rival cartel. But when the Aztecas arrived at the location where the vehicle had been spotted, they found a white Honda Pilot with Mexican plates and a similar-looking white Toyota with Texas plates. Unsure which vehicle might be affiliated with the rival cartel, an Azteca leader ordered Diaz and Perez to kill the occu-pants of both. Perez and his hit team pursued the Honda, killing Jorge Salcido and injuring his children. Meanwhile, Diaz and his hit team at-tacked the Toyota, murdering Leslie Enriquez and her husband, Arthur Redelfs. Soon after the murders, the Aztecas realized that the orches-trated hit had been a mistake and that none of the three victims were affiliated with the rival cartel. (*See* pp. 7–11.)

## A.    The Barrio Azteca

The Barrio Azteca is a paramilitary gang formed by inmates in the Texas prison system. (ROA.1869-70, 1736-37, 1189.) Although it began in Texas prisons, it developed into a street gang and now has roughly 3,500 members in the United States and Mexico, primarily in the El Paso and Juarez, Mexico, areas. (ROA.1863, 1869-71, 1618.) But the gang headquarters remains the Coffield Unit, a Texas prison, which maintains communications with Aztecas on both sides of the border and directs "everything the [Aztecas] do." (ROA.1716:7-10, 1718:24-1719:13, 1737-38, 1869-71, 1891-92, 1613:24-1614:5.)

The gang's charter sets forth a command structure, hierarchy of ranks, and strict rules of order. (*See, e.g.*, ROA.1210-11, 1722, 1733-36, 1886-91, 1939-40, 1207.) Prospective members must be sponsored by a current Azteca member and, before their acceptance, must pass a background investigation by Azteca leadership to determine their affiliation with other gangs or prior cooperation with law enforcement. (ROA.1213, 1875-76.) Members are then provided with the gang's "sacred rules" and are required to follow the chain of command or face discipline. (ROA.1210, 1225-26, 1722, 1733-34, 1886-91, 2197-98.) The Azteca's paramilitary command structure has ranks increasing from prospective member, to soldier, to sergeant, to lieutenant or captain. (ROA.1207.) An Azteca who does not follow the order of a leader would be disciplined or killed. (*E.g.*, ROA.1424:18-23, 1850:14-21, 2267:19-21, 1797-98.)

3

Once initiated, Azteca membership is for life. (ROA.1211, 1718, 1722, 1891:2.) Members released from prison are expected to continue their membership and must report to Azteca leadership upon release. (ROA.1213, 1724.) One of the primary goals of the gang is to "see each other as brothers" and "help each other" in prison. (ROA.1205-06.) As such, gang members on the streets send money to Aztecas in prison. (ROA.1631, 1782-90, 1940, 1981-82, 1220.) To garner these funds for the incarcerated members—and for their own profit—Aztecas engage in a variety of illegal activities on both sides of the Texas-Mexico border, including extortion and drug trafficking. (*See, e.g.*, ROA.1940, 1292-93, 1369, 1537, 1758-65, 1791-96, 1894-99, 1981-82.)

The Aztecas used coordinated violence to carry out their illegal activities. (ROA.1899-1900, 1206, 1323-25, 1537, 1945-47, 1976.) For example, the Azteca "clean[ed]" their territory to enable their drug sales, which included killing rival dealers or gangs. (ROA.1230-33, 1263, 1271, 1328.) The Aztecas also assaulted and killed those who refused to pay extortion. (ROA.1291-96.) Aztecas committed many of these murders in groups, and their killings often involved gruesome violence to "prove a point." (*E.g.*, ROA.1256-57, 1327, 1331, 1342-47, 1351-52, 1357-60.)

## B. The Defendants' Role in the Aztecas

In 2007 or 2008, the Azteca allied themselves with the Juarez Cartel and its enforcement arm, La Linea. (ROA.1297-98, 1303, 1956.) As a result, the Azteca joined the Juarez Cartel's rivalry with the Sinaloa

Cartel and its affiliate gangs during the war between the two cartels. (ROA.1302, 1953-56, 2073.)

During this time, Arturo "Benny" Gallegos Castrellon, an Azteca lieutenant, was one of the top leaders in Juarez. (ROA.1948, 1954-55.) Benny and other Azteca leaders formed "hit teams" that kidnapped, interrogated, tortured, and killed associates of rival cartels. (ROA.1323-25, 1328-30, 1966-67, 1970-71.) The hit teams worked together, providing support for each other, and serving as lookouts during kidnappings and murders. (ROA.1976, 1328, 1330, 1338-40, 1354-55, 1967, 1994-95, 2217.) The Aztecas even provided training for their hit team members so they could "kill people easier." (ROA.1366-68, 1958.)

Diaz and Perez were sicarios (hitmen) who led hit teams for the Aztecas. (ROA.1327-28, 1341, 1352, 1955, 1972-76, 2212, 1956:17.) In this role, both defendants committed or participated in many kidnappings and murders, often on Benny's orders. (ROA.1972-73, 1976-79, 1988-95, 2213-14, 2222-29.)

## C. Cross-border Cooperation During the Cartel War

Since its formation as a prison gang in Texas, the Barrio Azteca made internal gang communication a priority. One of its "sacred rules" was that "communication is essential" and that "nothing will be accomplished without communication." (ROA.1738:23-1739:2, 3688.)

In the early days, the gang communicated between prisons using "kites," or letters sent through an intermediary. (*See, e.g.*, ROA.1209,

1719-20, 1865.) Later, as the Azteca began operations on both sides of the Texas-Mexico border, the gang maintained a daily cross-border line of communication. (ROA.1873, 1454, 1870-71.) Azteca leaders in prison communicated their orders and directives to its members on the streets, including those in Juarez, through letters and phone calls. (ROA.1870-71, 1873; *see also* ROA.1618-19, 1719, 1870-71, 1874.) Aztecas in Juarez coordinated with Aztecas in the United States through in-person meetings, phone calls, radios, and letters. (ROA.1873, 1739.) The Azteca on both sides of the border used this constant communication to coordinate their illegal activities. (ROA.1299-1300, 1361-62.)

Among the Azteca members in Juarez, Chino Valles served as the liaison with the gang's members in the United States. (ROA.1874.) Valles, an Azteca lieutenant with deep ties to El Paso, was "in charge of communicating with the [Aztecas] in El Paso." (ROA.1987:20-24, 1372, 1373:2-4, 1411:8-12.) When members were released from prison, leaders in the U.S. would provide Valles "with the exact date and when they expect that individual to end up in Juarez," and the member was expected to report to Valles upon arrival to be "put to work with the gang." (ROA.1874.) Valles also determined from Aztecas in the United States whether a person was a member, whether he had been vetted by U.S. leaders, or "if they needed more members of Barrio Azteca to be sent from El Paso to Juarez." (ROA.1952, 1988, 1373.)

**D.    The Consulate Murders**

In March 2010, Benny became concerned because he had noticed a white Honda Pilot passing by his house and parking nearby. (ROA.1383, 1400, 1468, 2229, 2295.) He radioed Perez—his then-head of security—and placed a "look-out" for a "white Pilot" and two men, whom he described as looking like "foreigners" from the Mexican state of Guerrero. (Gov't Ex. 5B; ROA.1383, 1400-01, 1964.) Perez responded that his team would be "watching" for the car, but the Azteca were unable to locate the vehicle at that time. (Gov't 5B at 00:25–:40; ROA.1401.)

The Honda Pilot that concerned Benny had Texas license plates. (ROA.1411.) Benny called upon Chino Valles, the Azteca in charge of communication between Juarez and the United States. (ROA.1373.) Benny instructed Valles to "check on" the white Pilot with Texas plates to get an address where it was registered. (ROA.1411-12.)

On March 13, a consulate employee hosted a birthday party for her child at a party hall in Juarez. (ROA.2330, 2332.) Multiple employees of the U.S. consulate attended the party, including Leslie Enriquez, a U.S. citizen and consulate employee; her husband, Arthur Redelfs; and their young daughter. (ROA.2329, 2331, 1122.) Hilda Antillon, another consulate employee (ROA.2326), also attended the party with her husband, Jorge Salcido, and their three children. (ROA.2326, 2328, 2330.)

During the party, Benny learned that the "lookout" he had placed for the white Honda Pilot from the Sinaloa Cartel had been fruitful, and

that a car matching that description had been located near a children's party hall. (Gov't Ex. 5C at 3:25–4:09; ROA.1384, 1403, 2005.) Benny provided the address over the radio and ordered Aztecas—including Diaz and Perez—to wait until the Pilot's driver returned to the parked vehicle and kill him. (ROA.1385-86, 1391, 1404, 1406, 2005-07, 2230-31; *see also* Gov't Ex. 5C at 3:25–:41 (Benny stating, "I already [ ] found the white Pilot, dude. So write down this address so you can send the look-outs.").) Perez headed over to the location from an Azteca safehouse. (ROA.2237, 2005:12-23.) Diaz delayed committing his list of other murders for the day to engage in the mission. (ROA.1402-03, 2003; Gov't Ex. 5C at 00:09–01:13.)

Benny had told Perez to be on the lookout for a Honda Pilot with Texas plates, but when the Azteca hit teams arrived, they saw two vehicles at the party hall—a white Honda Pilot with Mexico plates and a white Toyota RAV4 with Texas plates, parked near each other. (ROA.1387, 2232, 2001; Gov't Ex. 5E at 0:00–5:11.) When the party ended, Jorge Salcido left with his children in his white Honda Pilot. (ROA.2334-35.) Leslie Enriquez and Arthur Redelfs left the party with their daughter in the Toyota RAV4 around the same time. (*See* ROA.2232, 2334.)

Benny directed the Aztecas to follow both vehicles. (ROA.1391, 1406-08, 2008, 2232-34, 1387.) Diaz and his team followed the Toyota with Texas plates. (1408-09, 2233, 2239:22-25.) Diaz informed Benny

that the vehicle he was following was "a Toyota, not a Pilot." (ROA.2240:4-6, 2008, 1407, 1388:22-25; Gov't Ex. 5E at 06:21–:31.) Diaz also described the driver of the Honda to Benny, saying he "looks just like you . . . just as light skinned as you are." (Gov't Ex. 5E at 07:26–:35; ROA.2240.) But Benny directed Diaz to "hit him [a]nyway, man, because he left from there." (Gov't Ex. 5E at 07:40–:55; 2240:9-12, 1407.) Diaz responded, "All right, you got it . . . I'm going to hit the fucker then." (Gov't Ex. 5E at 07:75–08:13; ROA.1408, 2008.)

Over the radio, Diaz said he "had enough of the asshole" and directed the other Aztecas to stop next to the Toyota and box it in to prevent its escape. (Gov't Ex. 5E at 08:48–10:30; ROA.2250, 1409.) Diaz then shot into the Toyota's passenger-side door. (ROA.2235-36.) The Toyota jumped a median and fled the scene, and the pursuit continued. (ROA.2236.) When Diaz's team caught up with the Toyota, Diaz climbed out of the passenger window, onto the frame, and began shooting at the Toyota. (ROA.2236-37, 1416) Diaz then told Benny, "'That's it! He's down, he's down at city hall, man. He's down. The asshole ran, but I caught up to him there." (Gov't Ex. 5E at 11:23–:33; ROA.2009, 2251-52, 1409.) Diaz had murdered Enriquez and Redelfs. (*See* ROA.1392, 2073, 1093, 1108, 2301-04.)

Meanwhile, Perez's team followed the white Honda Pilot and Perez radioed Benny to report that it did not have Texas plates. (Gov't Ex. 5E at 09:36–:42; ROA.2239, 1389.) Benny gave the order to attack and told

9

his men not to "let it get away." (Gov't Ex. 5E at 09:44–:48; ROA.1389.) Jorge Salcido's wife—following in a separate car—watched as Perez began shooting at her husband's Honda Pilot. (ROA.2337.) The assailants drove away and then came back and launched another attack. (ROA.2338, 1410.) Salcido's wife got out of her car and screamed at the Aztecas to stop shooting. (ROA.2338.) When Perez and his hit team eventually left, Salcido's wife opened the door of the Honda Pilot to find her mortally wounded husband. (ROA.2339-41, 2344.) Her wounded children—then aged two, four, and seven—were "crying and bleeding from their head[s]." (ROA.2341.) One of the children had bullet fragments lodged in his head. (ROA.2343.) His mission completed, Perez updated Benny over the radio, noting that there were children onboard the Pilot. (Gov't Ex. 5E at 11:04–12:44; ROA.2009.)

Following the murders, Chino Valles contacted the police to confirm that the occupants of the vehicles had been killed. (ROA.1412.) Arthur Redelfs was hit by nine bullets that had gone through his neck, fractured his cervical spine, cut the carotid artery, which carries blood to the head, and transected his spinal cord. (ROA.2310-17). Leslie Enriquez, was shot twice in the head, with one bullet that "bursted" her eye and another fatal shot through her brain. (ROA.2318-21.) She was 16-weeks pregnant. (ROA.2321.) Jorge Salcido suffered 12 gunshot wounds from his head to his knee and died from the multiple gunshot wounds that severed his major blood vessels. (ROA.2323.)

The lookout that Benny had originally placed was for a white Honda Pilot with Texas license plates. (ROA.1411, 1424.) The Aztecas had assassinated the occupants of a Toyota RAV4 with Texas plates and a Honda Pilot with Mexican plates. (Gov't Ex. 5E; ROA.2239:22-25, 2344:5-6, 2008, 3513, 3753). Only later did the Aztecas learn of their "huge mistake." (ROA.2010, 2296, 2001.)

## E.    Investigation

In cooperation with Mexican authorities, the FBI began an investigation into the murders. (ROA.1119-39.) They obtained radio interceptions related to the consulate murders, including from the day of the murder. (ROA.1124-27.)

In 2011, Benny, Diaz, Perez, and 32 co-defendants were charged in the Western District of Texas with various offenses related to their participation in the Barrio Azteca criminal enterprise and their involvement in the murders of Leslie Enriquez, Arthur Redelfs, and Jorge Salcido.

| Count 1 | RICO conspiracy<br>18 U.S.C. § 1962(d) |
|---------|------------------------------------------|
| Count 2 | Conspiracy to distribute and possess with intent to distribute heroin, cocaine, and marijuana<br>21 U.S.C. §§ 846, 841 |
| Count 3 | Conspiracy to import heroin, cocaine, and marijuana<br>21 U.S.C. §§ 963, 952, and 960 |
| Count 4 | Conspiracy to launder monetary instruments<br>18 U.S.C. § 1956 |

| **Count 5** | Conspiracy to kill persons in a foreign country<br>18 U.S.C. § 956(a)(1) |
|---|---|
| **Counts 6–8** | Murder resulting from the use and carrying of firearms during and in relation to crimes of violence and drug trafficking<br>18 U.S.C. §§ 924(c), (j), and 2 |
| **Count 9–11** | Murder in Aid of Racketeering<br>18 U.S.C. §§ 1959(a)(1), 2 |

(ROA.194-250). Diaz and Perez were extradited from Mexico. (*See* ROA. 1182.)

## F.    Trial & Sentencing

At trial, the government introduced testimony of multiple Azteca cooperators, including Jesus "Camello" Chavez Castillo, the "boss" of the Azteca hit teams. (ROA.1323-25, 1390:6-7.) Camello testified that Benny had placed the lookout on the Pilot and had instructed Chino Valles "to check on a white Pilot with Texas plates" and "try to get the address to where it was registered." (ROA.1382-83, 1400-01, 1411-12, 1424, 1373.) Camello testified that he had been monitoring Azteca radio traffic at the time of the murders. (ROA.1385-92.)

The government also introduced testimony from Alberto "Fresa" Payan, an Azteca sicario and hit team leader who participated in many murders with Diaz and Perez. (ROA.1964-65, 1971-72, 1973-74, 1976, 1982-92.) Fresa had also been monitoring Azteca radio traffic at the time of the murders. (ROA.2000-01.) Miguel "Lentes" Nevarez, another

cooperating Azteca, testified that he had followed the Toyota on Benny's orders and had been present when Diaz murdered Enriquez and Redelfs. (ROA.2229-37, 2250-52.) The court admitted the intercepts of the Azteca radio traffic before and during the murders. (*See* Gov't Ex. 5A–I; ROA.1397.)

After the government's case concluded, Perez's and Diaz's counsel moved for a judgment of acquittal. ROA.3241. Perez's counsel argued that the evidence was insufficient to prove the RICO conspiracy count (Count 1) and the conspiracy to murder in a foreign country count (Count 5). (ROA.2358-60.) Regarding Count 5, Perez argued that the government failed to prove an overt act in the United States or that any conspirator was in the United States at the time of the agreement. (ROA.2359-60.) Diaz joined this argument and also challenged the sufficiency of the evidence to prove the drug-trafficking and money-laundering counts (Counts 2 through 4). (ROA.2360-62.) He did not challenge the sufficiency of evidence proving Counts 8 and 11, relating to the murder of Jorge Salcido. After the government's response, the court denied the defendant's motions. (ROA.2369-70.)

The jury was instructed that, to convict Diaz and Perez on Count 5, it had to find beyond a reasonable doubt that one of the conspirators committed an overt act within the United States and that one of the conspirators was within the United States at the time of the agreement. (ROA.2436.) During closing argument, Perez's counsel urged the jury to

acquit on Count 5 because all acts had occurred in Mexico and no overt acts had occurred in the United States. (ROA.2536-39; *see also* ROA.2546 (government rebuttal).) At the end of the 11-day trial, the jury convicted Diaz and Perez on all counts. (ROA.2573-82.)

Diaz and Perez were sentenced to concurrent life sentences for Counts 1, 2, 3, 5, 9, 10, 11, to run concurrently to a 240-month sentence on Count 4.[1] (ROA.2611, 2624, 721, 727.) The court further imposed three additional life sentences on Counts 6, 7, and 8, to run consecutively to all other counts.[2] (ROA.2611, 2624, 721, 727.) This appeal followed.

---

[1] Perez's guidelines range included an obstruction-of-justice adjustment that will be discussed under Issue 3.

[2] The consecutive life sentences for Counts 6 through 8 will discussed under Issue 4.

## SUMMARY OF THE ARGUMENTS

1.     Sufficient evidence supports the defendants' convictions for conspiracy to commit murder in a foreign country. The evidence showed that an Azteca leader ordered his men to be on the lookout for a Honda Pilot with Texas license plates, and that he ordered his fellow gang members in El Paso to investigate the vehicle's registration. When the vehicle was located, Perez and Diaz were ordered to murder the occupants. The evidence was therefore sufficient to support the jury's verdict.

2.     The record was not devoid of evidence supporting the jury's verdict on Counts 8 and 11. The evidence showed that the Aztecas carried out a coordinated attack on two similar SUVs matching the description of a rival gang members' vehicle. After an Azteca leader ordered the hit, Diaz, a sicario, agreed to participate in the murder and arrived at the location with a gun. Although he was not physically present when the fatal shots were fired, his participation in the crimes was nevertheless sufficient to show he aided and abetted Salcido's murder.

3.     The district court did not clearly err when it applied an obstruction adjustment under section 3C1.1. The court plausibly concluded that Perez's obstructive conduct occurred after the investigation began.

4.     The government agrees that Diaz's sentences on Counts 6 through 8 should be vacated. The district court's failure to exercise its discretion at sentencing on the § 924(j) counts was plain error under *Lora v. United States*, 143 S. Ct. 1713 (2023).

## ARGUMENTS

**1.    Sufficient Evidence Supports the Defendants' Convictions for Conspiracy to Commit Murder in a Foreign Country.**

### (Diaz Issue 1, Perez Issue I)

**A.    Standard of Review**

This Court reviews preserved challenges to the sufficiency of the evidence de novo, "with a heavy thumb on the scale in favor of the verdict." *United States v. Cabello*, 33 F.4th 281, 288 (5th Cir. 2022). Indeed, this Court's review is "highly deferential" to the jury's finding of guilt. *United States v. Zamora-Salazar*, 860 F.3d 826, 831 (5th Cir. 2017). The Court will uphold the jury's verdict so long as any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc). The Court views all evidence and all reasonable inferences drawn from it in the light most favorable to sustaining the verdict. *United States v. Mauskar*, 557 F.3d 219, 229 (5th Cir. 2009). "Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." *United States v. Rodriguez-Mireles*, 896 F.2d 890, 892 (5th Cir. 1990). The jury is free to choose among reasonable constructions of the evidence. *United States v. Pennington*, 20 F.3d 593, 597 (5th Cir. 1994).

16

**B.    Argument**

Sufficient evidence supports the defendants' convictions for conspiracy to commit murder in a foreign country, in violation of 18 U.S.C. § 956(a)(1). That provision requires proof that the defendant 1) agreed to commit a murder outside the United States; 2) that he willfully joined the agreement with the intent to further its unlawful purpose; 3) that a conspirator committed an overt act in furtherance of the conspiracy in the United States; 4) and a conspirator was in the United States at the time he conspired. *United States v. Wharton*, 320 F.3d 526, 538 (5th Cir. 2003). The defendants do not dispute that they willfully joined an agreement to murder the occupants of a white Honda Pilot with Texas license plates. They argue only that the evidence did not prove that a conspirator committed an overt act in furtherance of the conspiracy within the jurisdiction of the United States. (Diaz Br. 19–25; Perez Br. 7–12.)

A reasonable jury could find that Perez and Diaz conspired with Aztecas in El Paso, who committed an overt act in the United States. The jury may infer these elements from circumstantial evidence, "such as the co-conspirator's concerted actions." *United States v. Castrellon*, 636 F. App'x 204, 206 (5th Cir. 2016) (quoting *United States v. Gallo*, 927 F.2d 815, 820 (5th Cir. 1991)). Extensive evidence regarding the operation of the Barrio Aztecas, coupled with evidence that Benny ordered that his men involve the El Paso Aztecas in the investigation of the Honda Pilot, was sufficient for a reasonable juror to conclude that an Azteca both

17

conspired, and committed an overt act, within the jurisdiction of the United States. The evidence showed Benny ordered Chino Valles to contact Azteca members in El Paso to initiate an investigation into the Honda Pilot that had been spotted in Juarez. (ROA.1987:20-24, 1371-73, 1411:8-12.) Benny instructed Valles to "check on" the white Pilot with Texas plates to get an address where it was registered, a task that fell to Valles as part of his job as the cross-border liaison. (ROA.1411-12.) Drawing all reasonable inferences in favor of the government, this evidence was sufficient for a reasonable juror to conclude that Chino Valles contacted El Paso Aztecas, and as ordered, he enlisted their help in investigating the Pilot.

These conclusions logically follow from trial evidence about the Azteca's operations, structure, and Benny's and Valles' responsibilities within that structure. *See United States v. Portillo*, 969 F.3d 144, 165 (5th Cir. 2020) (holding VICAR conviction was supported by circumstantial evidence regarding defendant's role in the enterprise and the organization's hierarchical structure); *see also United States v. Shows Urquidi*, 71 F.4th 357, 376 (5th Cir. 2023) (conspiracy conviction supported by evidence of defendant's leadership role in cartel). The Azteca had a long history of communication and cooperation across the Texas-Mexico border. Although the gang operates in Mexico, it was founded in Texas and its headquarters remains the Coffield Unit of the Texas prison system, which maintains communications with Aztecas on both sides of the

border and directs "everything the [Aztecas] do." (ROA.1716:7-10, 1718:24-1719:13, 1737-38, 1869-71, 1891-92, 1613:24-1614:5.) Gang members on both sides of the border regularly interact and coordinate their activities. (*See, e.g.,* 1454, 1870-71, 1873-74, 1454, 1618-19, 1719, 1739, 1952, 1988, 1373.) Communication was a priority for the gang, so much so that it was one of the organization's "sacred rules." (ROA.1738:23-1739:2, 3688.) Given the extensive evidence of frequent cross-border communication and coordination, a reasonable juror could infer that Juarez Aztecas contacted their El Paso counterparts and enlisted their assistance in the operation against the Pilot.

The evidence showed that Benny relayed his order to the El Paso Aztecas through Valles, who was the Juarez Azteca in charge of communication with Aztecas in the United States. (ROA.1874, 1987-88, 1372-73, 1411:8-12.) Benny's order for Valles to "check on" the white Pilot with Texas plates to get an address where it was registered was routine for Valles. (ROA.1411-12.) A reasonable juror could infer that Valles fulfilled his usual role in this situation. In fact, the evidence showed that if Valles had failed to follow Benny's order, he would have faced severe consequences, including death. (ROA.1424:18-23; *see also* 1850:14-21, 2267:19-21, 1797-98, 1374:2-8.)

Within this context, the evidence that Benny issued an order to involve El Paso Aztecas in the investigation of the Pilot sufficiently established that a conspirator committed an overt act in furtherance of the

conspiracy, within the jurisdiction of the United States. A juror could reasonably infer that an Azteca in El Paso, receiving Valles' call, was within the jurisdiction of the United States at the time he agreed to help his Juarez counterparts investigate the Pilot. After all, that cooperation was routine, and the failure to give it would have brought serious consequences. This circumstantial evidence indicates that an El Paso Azteca joined the conspiracy in the United States. Contrary to Diaz's claim (at Br. 22), it is immaterial that the exact identity of this conspirator was unknown to the jury. *See, e.g.*, *United States v. Vasquez*, 677 F.3d 685, 694 (5th Cir. 2012) ("While it takes at least two to tango for conspiracy purposes, the government is not required to identify each of the co-conspirators by name.") (cleaned up); *United States v. Fernandez*, 559 F.3d 303, 327 (5th Cir. 2009) ("Co-conspirators need not be identified in the indictment.").

A reasonable juror could also infer that a co-conspirator committed an overt act within the jurisdiction of the United States in furtherance of the conspiracy. While Diaz asserts (at Br. 22) that there is no evidence that the Aztecas in Juarez actually investigated the Pilot's registration, whether they ultimately succeeded in their investigation is irrelevant. "An 'overt act' is 'any act' in furtherance of the conspiracy's criminal objective, whether independently forbidden or not." *United States v. Read*, 710 F.3d 219, 226 (5th Cir. 2012). Based on the trial evidence of the structure of the Barrio Azteca, a reasonable juror would have found it

inconceivable that the El Paso Aztecas did not take some action when ordered to do so by Valles, an Azteca lieutenant. (ROA.1370-71.) Indeed, a juror could conclude that the Aztecas in El Paso committed an overt act even by discussing the Honda Pilot with their Juarez counterparts on the phone. *See United States v. Rommy*, 506 F.3d 108, 120 (2d Cir. 2007) ("It is beyond question that telephone calls can constitute overt acts in furtherance of a conspiracy."); *United States v. Caldwell*, 16 F.3d 623, 624 (5th Cir. 1994) ("Telephone calls to a particular destination containing detailed pick-up and drop-off instructions are certainly overt acts made in furtherance of the conspiracy.").

It is significant that the challenge raised in the defendants' appeals regarding the sufficiency of proof that Aztecas in United States conspired in the murder has already been considered and rejected by this Court in Benny's earlier appeal. *See Castrellon*, 636 F. App'x at 206–07. It is true that the Court applied plain-error review in that appeal and that the evidence in Benny's separate trial, while very similar, was not identical to the evidence presented at Diaz and Perez's trial. (*See* Diaz Br. 23–24.) But—at the very least—it is extremely persuasive that the Court already reviewed essentially the same facts proving the same charge and determined that it legally sufficed.

For example, the Court has already held that Benny's order to Valles to contact the El Paso Aztecas to find the address to which the Honda Pilot with Texas plates was registered "constitutes an overt act in the

United States." *Castrellon*, 636 F. App'x at 207. It explained that the jury in Benny's case, based on nearly identical evidence, could "reasonably infer that Valles telephoned El Paso based on his role in the Aztecas." *Id.* at 206. Just as here, the evidence at Benny's trial showed that "Valles conducted the communication between Juarez and El Paso, a telephone call to El Paso would be routine for him, and there is no reason to assume that he would not follow Gallegos' direct order." *Id.* at 206–07. The Court also observed that "the chance that Valles contacted El Paso is heightened considering how important the Aztecas considered communication." *Id.* at 207. And the Court held that a reasonable jury could infer "the El Paso Aztecas received this call and understood the request" because "[t]he notion that an El Paso Azteca would not take some action on an order by a lieutenant such as [Benny] is extremely unlikely—they could face punishment including death for failing to follow such an order." *Id.* at 207. Finally, the Court decided that the evidence of the cross-border communication between Juarez and El Paso about their illegal activities tended to prove that the El Paso Aztecas likely understood that Benny planned to take violent action against its owner and implicitly agreed to further this unlawful purpose. *Id.*

The Court's previous determination that Valles' phone call to El Paso satisfied the same § 956(a)(1) elements contested here carries great persuasive force. Viewing the evidence, and all reasonable inferences from that evidence, in the light most favorable to the verdict, the jury

reasonably concluded that Azteca gang members in Texas participated in Benny's investigation of the white Honda Pilot and therefore aided in the conspiracy to murder its occupants. The defendants' convictions for conspiracy to commit murder in a foreign country should therefore be affirmed.

## 2.   The Record Is Not Devoid of Evidence Supporting the Jury's Verdict on Counts 8 And 11, Relating to the Murder of Jorge Salcido.

(Diaz Issue 2)

## A.   Standard of Review

As discussed, this Court reviews de novo preserved challenges to the sufficiency of the evidence. *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007). But where a defendant asserts specific grounds challenging specific counts for his Rule 29 motion, he waives all other grounds. *See United States v. Herrera*, 313 F.3d 882, 884 (5th Cir. 2002) (en banc). This Court will review his newly raised sufficiency claim only for a manifest miscarriage of justice. *United States v. Green*, 293 F.3d 886, 895 (5th Cir. 2002). Under this standard, this Court will only reverse if "the record is devoid of evidence pointing to guilt or if the evidence is so tenuous that a conviction is shocking." *United States v. Delgado*, 672 F.3d 320, 331 (5th Cir. 2012) (en banc) (cleaned up).

Although Diaz timely moved for judgment of acquittal, his motion raised only the narrow issues of whether the evidence sufficed to prove

Counts 1 through 5. (ROA.2359-62.) He did not challenge the sufficiency of evidence proving Counts 8 and 11, relating to the murder of Jorge Salcido. Both the government's response and the district court's ruling addressed Counts 1 through 4 only. (ROA.2362-70.) His insufficiency claims are therefore reviewed for a manifest miscarriage of justice.

## B.  Argument

The jury convicted Diaz on Counts 8 and 11, which alleged Diaz's involvement in the murder of Jorge Salcido. Count 8 alleged that Diaz aided and abetted the use of a firearm, causing Salcido's murder. (ROA.240-41.) 18 U.S.C. §§ 924(j), 2. Count 11 alleged that Iglesias aided and abetted the murder of Salcido in aid of racketeering. 18 U.S.C. §§ 1959(a)(1), 2. (ROA.245.) The record was not devoid of evidence to support the jury's verdict on these counts.

The Violent Crimes in Aid of Racketeering (VICAR) statute penalizes those who commit murder "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity" § 1959(a)(1). Section 924(j) penalizes a person who causes a murder while using a firearm during and in relation to a crime of violence or drug trafficking crime. § 924(j)(1); *see also* § 924(c)(1)(A). A person is liable for these crimes as a principal if he "aids, abets, counsels, commands, induces, or procures" their commission or willfully causes them

to be done.[3] § 2; *see also United States v. Hankton*, 51 F.4th 578, 613 (5th Cir. 2022) (aiding and abetting a VICAR murder); *United States v. Foster*, 507 F.3d 233, 246 (4th Cir. 2007) (aiding and abetting § 924(j)). To be liable under an aiding-and-abetting theory, the evidence must prove that the defendant: (1) took an affirmative act in furtherance of a criminal offense (2) with the intent of facilitating the offense's commission. *United States v. Carbins*, 882 F.3d 557, 563–64 (5th Cir. 2018) (quoting *Rosemond v. United States*, 572 U.S. 65, 71 (2014)).

The record was not devoid of evidence that Diaz aided and abetted Salcido's murder. Diaz does not contest the sufficiency of proof that he intended to facilitate Salcido's murder but argues only that his actions did not suffice.[4] (Diaz Br. 27–28, 29.) The affirmative-act requirement for aiding-and-abetting liability "comprehends all assistance rendered by words, acts, encouragement, support, or presence—even if that aid

---

[3]Section 2 provides that a person "is punishable as a principal" if the person: (a) "aids, abets, counsels, commands, induces or procures" the commission of a criminal offense; or (b) "willfully causes an act to be done which if directly performed by him or another" would be a federal crime.

[4] There was, in fact, abundant evidence of Diaz's culpable intent. The intent element is satisfied when a person actively participates in a criminal venture "with full knowledge of the circumstances constituting the charged offense." *Rosemond v. United States*, 572 U.S. 65, 77 (2014). The jury reasonably inferred from the radio transmissions and witness testimony that Diaz, an Azteca sicario, went with his gun to the address Benny provided, knowing that the Aztecas would murder the SUV's occupants. (*See e.g.*, Gov't Ex. 5E; ROA.1327-28, 1391, 2006-08, 2212-13, 2230, 2234.) *See also United States v. Shows Urquidi*, 71 F.4th 357, 378 (5th Cir. 2023) (holding that defendant's "general knowledge regarding how the Cartel handled matters" was evidence of his knowledge that the victim would likely be murdered).

relates to only one (or some) of a crime's phases or elements." *Rosemond*, 572 U.S. at 73 (cleaned up). It is "irrelevant" whether the accomplice was present, whether he participated in the crime, or "the importance of the aid rendered"; the accomplice need only facilitate or aid the crime. *Id.* at 73–74, 75; *see also United States v. Hansen*, 143 S. Ct. 1932, 1940 (2023) (holding that facilitation does not require "lending physical aid; for both, words may be enough"). For example, "[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed." Wayne R. LaFave, 2 *Substantive Criminal Law* § 13.2(a) (3d ed. Oct. 2022 update), Westlaw SUBCRL § 13.2(a); *see also* Jens David Ohlin, 1 *Wharton's Criminal Law* § 10:11 (16th ed. Sept. 2022 Update), Westlaw CRIMLAW § 10.11 ("It can be enough, for example, to serve as a lookout for a criminal endeavor, even if no police arrive on the scene and the role of the lookout turns out to be unnecessary. In these situations, the lookout nonetheless facilitates the crime by giving the principal perpetrator the encouragement needed to commit the crime, knowing that the lookout will send out the alert if the police arrive."). A jury may reasonably conclude that a defendant aided or abetted another in the commission of a crime from evidence of his "collaboration and close cooperation" in the crime. *See Pereira v. United States*, 347 U.S. 1, 10 (1954); *see also United States v. Bell*, 812 F.2d 188, 194 n.9 (5th Cir. 1987) (holding that aiding-and-abetting liability existed where "each

accomplice, acting in concert, committed part of a single offense which occurred only through their joint action").

Viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences in its favor, Diaz took sufficient actions to further Salcido's murder. Diaz was the leader of an Azteca hit team, who carried out many murders of Azteca rivals, sometimes with Perez. (ROA.1327-28, 1341, 1352, 1955, 1972, 2212, 2228.) Perez and Diaz jointly followed Benny's orders to kill the occupants of a white Pilot. (ROA.1385-86.) After coordinating over the radio and postponing his daily murder list, Diaz went to the address—armed with a pistol—to help carry out this murder. (ROA.1325, 2234, 2250-51.) The jury could reasonably infer that Diaz carried the firearm to "protect or facilitate" the group's efforts. *See United States v. Gonzales*, 841 F.3d 339, 354 (5th Cir. 2016). It could also infer that Diaz's armed support emboldened Perez and his team. *See* Black's Law Dictionary (11th ed. 2019) (defining "encourage" as "to embolden"). After another Azteca provided the drivers' locations and descriptions over the radio, Diaz and other Aztecas acted in concert to carry out the murders, with Perez's team following one vehicle matching Benny's description while Diaz's team simultaneously followed the other. (ROA.1391, 1407; Gov't Ex. 5E.) Diaz and Perez each provided real-time updates and instructions over the radio because communication was essential to the success of the mission. (ROA.1361, 2237-38, 2250-51.) The jury could also reasonably infer that, once Diaz had

completed his mission and killed the Toyota's driver, he was expected to support the attack on the other SUV. (*See* Gov't Ex. 5E at 07:47–:56 (Benny orders Diaz to kill Salcido "because he left from there . . . and then we have to be ready for the other one.").) The court properly instructed the jury that acting as "merely a knowing spectator" was not sufficient to establish that Diaz aided and abetted the crimes. (ROA.2441:13-16.) Considering this evidence, the record supports the jury's finding that Diaz took an affirmative act to further Salcido's murder sufficient to support his aiding-and-abetting liability on Counts 8 and 11.

On appeal, Diaz argues that he did not take any action to kill Salcido because he was elsewhere committing his "own chase and his own shooting" at the time. (Diaz Br. 27.) This argument should be rejected. For one, Diaz aided the crime as soon as he agreed to show up at the party hall with a gun to help murder the occupants of the white SUV who had been casing Benny's residence. Diaz was a sicario whose role was to murder, often on Benny's orders. (ROA.1327-28, 1341, 1352, 1955, 1972, 2212.) The evidence showed that the Aztecas murdered in groups, with some serving as lookouts and others providing support. (ROA.1976:2-4, 1324-25, 1971, 2217.) The jury could infer that Perez was aware of Diaz's presence and support from the radio transmissions, where Diaz stated that he was ready at the scene and had his short pistol with him. (ROA.2007; Gov't Ex. 5E at 02:04–03:51.) It was "irrelevant" that Diaz was not physically present when Perez fired the shots that killed Salcido.

*See Rosemond*, 572 U.S. at 73–74, 75. This Court should decline to carve the Azteca's murder scheme "into discrete subparts and to absolve any malefactor who was not physically present at every misdeed." *Bell*, 812 F.2d at 195.

Diaz's argument also misses the mark because it wrongly suggests that he is not liable for aiding Perez's murder because Salcido was not Diaz's intended victim. Diaz was acting to further the intended murder of the rival gang member who had been casing Benny's residence. (ROA.1383.) He should not be absolved because he aided the murder of an accidental victim who was not involved in the Juarez drug war. (ROA.2010.) A principal is liable for murder if he sets out to commit a murder and, in doing so, committed that act against the wrong person. *See, e.g., United States v. Concepcion*, 983 F.2d 369, 381–82 (2d Cir. 1992). Whether Perez murdered the intended victim, a mistaken victim, or an innocent bystander, he would be equally liable for VICAR murder and § 924(j) under the bedrock principle of transferred intent. Likewise, an accomplice who takes an affirmative act in furtherance of a crime with the intent to facilitate it is liable under an aiding-and-abetting theory even when the principal commits the act against the wrong person or commits a different crime that is the "natural and probable consequence" of the target crime. *See, e.g., United States v. Vaden*, 912 F.2d 780, 783 (5th Cir. 1990); *see also United States v. Sampol*, 636 F.2d 621, 674–77

(D.C. Cir. 1980) (holding that accomplices were liable for death of unintended victim under doctrine of transferred intent).

Here, the record shows that Salcido's murder was the natural and probable consequence of the murder Diaz acted to further and intended to facilitate. Diaz and other Aztecas acted in concert with the intent to murder a suspected rival, but instead found two SUVs matching the description of the target vehicle. It was a likely consequence that the Azteca's collective actions on a Saturday afternoon in downtown Juarez would kill others beyond the rival they targeted, including bystanders and misidentified drivers of other white SUVs. In fact, Perez and Diaz knew that Benny had ordered them to follow and kill the occupants of both SUVs, even though neither vehicle nor driver precisely matched his original description, which only increased the likelihood that the wrong victim would be killed. (Gov't Ex. 5E; ROA.1391-92, 1409) A reasonable jury could conclude that the murder of Salcido was a natural and probable consequence of the crime Diaz acted to further and intended to facilitate. Indeed, if Perez had killed the Azteca's intended target instead of Salcido, there is little doubt that Diaz would be liable as an accomplice. Diaz therefore aided Salcido's murder, even though he was chasing down another potential target at the time.

### 3. The District Court Did Not Clearly Err in Applying the Obstruction-of-Justice Adjustment under USSG § 3C1.1.

(Perez Issue 2)

### A. Relevant Facts

Evidence at trial showed that Azteca member Jesus "Camello" Chavez provided Perez with the Ford Explorer that Perez used during the consulate murders. (ROA.1417.) Perez returned the Explorer after the murders and Benny ordered Camello to "make it disappear." (ROA.1418.) Camello instructed another Azteca associate to douse the Explorer with gas and light it on fire. (ROA.1418.) The Aztecas then "la[id] low and stay[ed] out of sight" in the days following the murders. (ROA.1419.) The "burned out" Explorer and a second vehicle used in the murders were later found in Juarez. (ROA.2091-92.)

The presentence report proposed an obstruction-of-justice adjustment under guidelines section 3C1.1 because Perez and other Aztecas "destroyed and burned the vehicles utilized in the Consulate murders." (ROA. 22-50956.2952, 2948.) Accordingly, the report added a two-level obstruction adjustment to Groups 1 through 6, which resulted in a base offense level of 48 for each group. (ROA. 22-50956.2954-60.) After applying the multiple-count adjustment, the combined adjusted offense level was 53, which was treated as a total offense level 43, the highest level. (ROA. 22-50956.2963.)

Perez objected to the obstruction adjustment because the burning of the vehicles "took place before any formal investigation by law

31

enforcement as contemplated by the Guidelines." (ROA. 22-50956.2978.) The government responded that the adjustment was appropriate because the vehicles were material evidence in the investigation and "[t]he destruction of these vehicles was done solely to prevent law enforcement investigation and subsequent prosecution for the murders." (ROA. 22-50956.2986.) It further observed that law enforcement had been investigating the Aztecas for years before the murders and that the investigation of the murders began immediately after they occurred, before the vehicles were destroyed. (ROA. 22-50956.2987.) The probation office declined to amend its report. (ROA. 22-50956.2994-95.)

Perez renewed his objection to the obstruction adjustment at the sentencing hearing. (ROA. 22-50956.2575-76.) The court overruled the objection, agreeing with the government that "[r]ight from the moment this all occurred, there were law enforcement ion the scene" and that the consulate murders were "a highly publicized offense." (ROA. 22-50956.2580.)

## B.    Standard of Review

This Court affords district courts "wide discretion" in implementing the sentencing guidelines, particularly with respect to findings of fact. *United States v. Hawkins*, 866 F.3d 344, 349 (5th Cir. 2017). When preserved below, a district court's application of guideline section 3C1.1 is a factual finding reviewed for clear error. *United States v. Ahmed*, 324 F.3d 368, 371 (5th Cir. 2003). The Court will find clear error "only if, based on

the entire evidence, [it] is left with the definite and firm conviction that a mistake has been committed." *United States v. Malone*, 828 F.3d 331, 337 (5th Cir. 2016) (citation omitted). The decision "must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *United States v. Hernandez*, 48 F.4th 367, 373 (5th Cir. 2022) (cleaned up). If, however, the district court's view of the evidence is "plausible," the Court will affirm "even if the judges on this Court, sitting as the trier of fact would have weighed the evidence differently." *Malone*, 828 F.3d at 337 (citation omitted).

## C.    Argument

The district court did not clearly err when it applied an obstruction-of-justice adjustment under guideline section 3C1.1. That section provides for a two-level increase "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." USSG § 3C1.1. The commentary explains that "obstructive conduct can vary widely in nature, degree of planning, and seriousness," and provides non-exhaustive examples of conduct to which the obstruction-of-justice adjustment is intended to apply. *Id.* § 3C1.1, comment. (nn.3–4.) "[D]estroying or concealing or directing or procuring another person to destroy or conceal evidence" is specifically enumerated as obstructive conduct if the evidence is "material to an official investigation or judicial

proceeding." *Id.* § 3C1.1, comment. (n.4(D)). Evidence is "material" to an investigation or proceeding where it "would tend to influence or affect the issue under determination." *Id.* § 3C1.1, comment. (n.6).

Here, the district court plausibly found that Perez's conduct qualified for the adjustment. Perez does not appear to dispute that his actions—giving the Explorer to other Aztecas after the murders so it could be destroyed—were obstructive in nature. Procuring another person to destroy evidence is specifically enumerated obstructive conduct under section 3C1.1. And there is little question that the vehicle Perez destroyed was material to the FBI's and Mexican law enforcement's investigations into the consular murders. Linking Perez and the Aztecas to the vehicles would "tend to influence or affect the issue under determination" in this case. *See* USSG § 3C1.1, comment. (n.6) (defining "material"). There was no clear error in the court's application of the adjustment.

This Court should reject Perez's claim that the court erred in applying the adjustment because the destruction of evidence "took  place  before any formal investigation by law enforcement." (Def. Br. 14–15.) The record supports the court's finding that the evidence was destroyed during the investigation. According to trial witnesses, law enforcement immediately arrived on scene (ROA.1081-82, 1094, 1108-09) and the FBI began its investigation less than three hours later upon learning that the victims included consulate employees and a U.S. citizen (ROA.1122,

2073). Because the investigation began immediately, Perez's obstructive conduct occurred during the investigation.

Alternatively, the adjustment was also warranted because the evidence was destroyed when Perez knew that a governmental investigation was imminent. Since its 2006 amendment, section 3C1.1 permits consideration of "pre-investigation conduct" so long as it occurs "with the defendant's correct belief that a governmental investigation is probably underway or will probably be underway." *United States v. Stubblefield*, 942 F.3d 666, 669 (5th Cir. 2019) (citing *United States v. Brooks*, 681 F.3d 678, 716 n.41, 717 (5th Cir. 2012)). Here, the brazen nature of the murders gave the Aztecas good reason to believe an investigation would soon be underway. Perez and his team chased down the Honda Pilot in broad daylight on city streets and open fired on its occupants, including the three children in the back seat, while a second hit team simultaneously attacked another vehicle carrying a mother and her baby. That the Aztecas pumped their police contacts for details (ROA.1412-14) and ordered its members to "lay low and stay out of sight" in the days following the murders (ROA.1419) showed their awareness of the law enforcement interest in the murders and that an investigation was already underway. The court therefore plausibly found that Perez caused evidence destroyed while correctly believing that law enforcement was probably or would probably investigate the murders.

Finally, any error in applying the adjustment was harmless. Error must be disregarded if it does not affect substantial rights. Fed. R. Crim. P. 52(a). Here, any error in applying the adjustment made no difference to Perez's sentence. The obstruction-of-justice adjustment raised Perez's adjusted offense level in each grouping from 46 to 48, and raised the combined adjusted offense level from 51 to 53. But the total offense level was reduced by default to 43, the highest offense level available under the guidelines. *See* USSG Ch. 5, Pt. A, comment. 2 (providing that in the "rare case[ ]" where a defendant's total offense level exceeds 43, it "is to be treated as an offense level of 43"). Because a two-level reduction would still result in a total offense level of 43, any error did not affect Perez's substantial rights. *See United States v. Nava*, 957 F.3d 581, 589 (5th Cir. 2020) (finding no effect on substantial rights where correction "would still result in a total offense level of 43"). Any error was harmless and Perez's sentence should be affirmed.

**4.    The Court Should Vacate Diaz's Consecutive Life Sentences Imposed for His § 924(j) Convictions Consistent with the Supreme Court's Recent Decision in *Lora v. United States*.**

### (Diaz Issue 3)

## A.    Standard of Review

Where a defendant fails to object below, this Court reviews a district court's interpretation of a sentencing statute for plain error. *United States v. Warren*, 986 F.3d 557, 566 (5th Cir. 2021). Error is plain when

it is clear or obvious and affects a defendant's substantial rights. *See United States v. Olano*, 507 U.S. 725, 733–35 (1993).

**B.    Argument**

The government agrees that Diaz's sentences on Counts 6 through 8, for violating 18 U.S.C. § 924(j), should be vacated and remanded for resentencing. Section § 924(j) authorizes a life sentence for murder in the course of violating 18 U.S.C. § 924(c). The record shows that the district court believed that a § 924(j) sentence must run consecutively to any other sentence imposed. (ROA.2663, 2719.) But while this appeal was pending, the Supreme Court held that § 924(c)(1)(D)(ii)'s bar on concurrent sentences does not extend to a sentence imposed under § 924(j) and that sentencing courts therefore have discretion to impose a concurrent life sentence for § 924(j) violations. *Lora v. United States*, 143 S. Ct. 1713, 1719 (2023). Although Diaz did not object below, the government concedes that the district court's failure to exercise its discretion at sentencing on the § 924(j) counts was plain error under *Lora*. *See Henderson v. United States*, 568 U.S. 266, 279 (2013). Diaz's sentences for those counts only should be vacated and remanded for resentencing.

## CONCLUSION

For these reasons, this Court should affirm Diaz's and Perez's judgments of conviction and Perez's sentences. The Court should further affirm Diaz's sentences in part and vacate his § 924(j) sentences (Counts 6–8) and remand for resentencing consistent with *Lora v. United States*.

Respectfully submitted,

JAIME ESPARZA
United States Attorney

/s/ ***Elizabeth Berenguer***
By:   ELIZABETH BERENGUER
Assistant United States Attorney

## CERTIFICATE OF SERVICE

On August 16, 2023, I filed this brief through this Court's electronic case-filing system, which will serve it on all registered counsel, including the defendants-appellants' counsel, Philip J. Lynch and Leonard Christopher Morales.

/s/ *Elizabeth Berenguer*
ELIZABETH BERENGUER
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), excluding the parts of the brief exempted by Rule 32(f), because it contains **8,805** words.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

/s/ *Elizabeth Berenguer*
ELIZABETH BERENGUER
Assistant United States Attorney